RANDALL, SAWYER & DYER v. MERIDETH & AILMAN.

No. 2541.

1. **Partner's Power to Bind his Firm.**—Between partners themselves and between the firm and persons dealing with it, it must be presumed that each partner is the agent of the firm, empowered to carry out its objects and transact the business for which the partnership was formed in the usual and customary way pursued by other firms engaged in a like business; and in the absence of restrictions on this power, rights must be adjusted in view of its existence.

2. **Usages of Business.**—The usages of firms engaged in the same character of business in the same country, as well as the general usage of the firm in the conduct of its business, may be looked to to ascertain the implied powers possessed by a partner.

3. **Power of a Partner to Borrow Money.**—It is well settled that members of a trading partnership have power to borrow money to be used for partnership purposes, and it is as well settled that members of what are termed nontrading partnerships have not such implied power.

4. **Trading Partnership—Definition Approved.**—If the partnership contemplates the periodical, or continuous, or frequent purchasing, not as incidental to an occupation, but for the purpose of selling again the thing purchased, either in its original or manufactured state, it is a trading partnership; otherwise, it is not.

5. **Mining Partnerships.**—It has been generally held that mining partnerships are nontrading partnerships, and the individual members of the firm are without power to borrow money on the credit of the firm, unless the power be given otherwise than by implication from the ordinary nature of the business.

6. **Charge of Court—Trading and Nontrading Partnerships.**—See instructions given which would have been the law, had the defendants formed a trading partnership, for use of which the money sued for had been borrowed; but assuming that liability existed if the money was borrowed and spent on work done in the usual course of business, they were erroneous when applied to the case of a mining partnership.

7. **Case in Judgment.**—Tiernan and Randall, Sawyer & Dyer, residing in Galveston, made a joint investment in mining property in Mexico. Tiernan was the manager in charge of the work of developing the mines. Assessments for the work of each year were paid for the years 1883, 1884, and 1885. When the money gave out the work was to suspend, as in fact it did in the first two years. In 1885, although the home partners gave express orders that the work should close when the funds furnished for that year's work should be expended, Tiernan kept up the work. For the work upon the mining property Tiernan raised money by loans from Merideth & Ailman, local bankers, who dealt alone with Tiernan, not knowing of his partners. M. & A. sued Tiernan, and at his instance they made his partners codefendants, who resisted payment. It was shown that they had refused to furnish more money for the mining work; that they had furnished as much as they were willing to stake on the enterprise. *Held*, upon such facts the court should have charged the jury that the plaintiff could

not recover of Randall, Sawyer & Dyer without showing affirmatively that Tiernan had express authority from them to borrow money on their credit for the mining enterprise.

APPEAL from Galveston. Tried below before Hon. Wm. H. Stewart. The opinion states the case.

*A. N. Mills,* for Dyer; *T. N. Waul* and *Ballinger, Mott & Ballinger,* for appellants. — 1. The appellants and Tiernan were tenants in common of certain interests in mining property in New Mexico, and were attempting to sink the mines so as to reach paying ore, for which experiment they agreed to contribute and did contribute the several amounts of cash respectively in proportion to their interests, to be expended by Tiernan therefor, and limiting his authority thereto. This did not constitute a partnership which gave Tiernan authority to bind them to third persons for any further outlays by him, although they may have been incurred in the work by usual and ordinary methods of sinking or attempting to develop said mines. Story on Part., secs. 83, 102a, 110, 111, 113, 126; 1 Coll. on Part., pp. 696 (note), 15, 16, 287, 288 (notes), 660, 770; Hawtayne v. Bourne, 7 Mee. & W., 595; Brown v. Byers, 16 Mee. & W., 252; Rickett v. Bennett, 4 C. B., 686; Dickenson v. Valpy, 10 Barn. & C., 128; Skillman v. Lackman, 23 Cal., 203, 206; McConnell v. Denver, 35 Cal., 365; Septembre v. Putnam, 30 Cal., 490; Manvillee v. Parks, 2 Pac. Rep., 212; Higgins v. Armstrong, 10 Pac. Rep., 232–37; Parchen v. Anderson, 5 Mon., 438; Durnel v. Stone, 30 Me., 304; Smelting Co. v. Smith, 13 R. I., 27; Smith v. Sloan, 37 Wis., 285; Kahn v. Smelting Co., 102 U. S., 641–45; Bissell v. Foss, 114 U. S., 261; Judge v. Braswell, 13 Bush, 69.

2. The authority of one partner to bind the firm is controlled by the law applicable to agency, and in commercial or trading partnerships each partner is authorized to use the firm name, and is considered the agent of the firm with power to bind it in all matters connected with the firm business, which relation has been established by the custom of merchants and generally accepted usages as being not only convenient but necessary from the nature of such business, and is applicable to no other species of partnership.

3. In noncommercial partnerships one who seeks to hold the firm bound upon a contract made by a single member must be able to show either express authority, or that such is the customary usage of the particular branch of business in which the firm is engaged, or such facts as will warrant the conclusion that the partner had been invested by his copartners with the requisite authority. Judge v. Braswell, 13 Bush, 67; Pease v. Cole, 53 Conn., 53; Smith v. Sloane, 37 Wis., 285; Banking Co. v. Beatson, 30 Eng. Rep., 493; Eastman v. Clark, 53 N. H., 764; Ah Lep v. Gong Choy, 9 Pac. Rep., 487; Thorn v. Smith, 21 Wend., 365; Story

on Part., secs. 102 (note), 102a, 126; 1 Coll. on Part., Woods' ed., 660, 770, and note; 2 Pars. on Cont., p. 181.

4. "Mining partnerships" differ from other partnerships in this, that other partnerships are based upon mutual confidence and formed by the consent of all the partners. In a mining partnership each partner has a right to dispose of his interest or a part of it, and bring into the concern a person, not only against the consent of his partners, but one that may be obnoxious to each or all of them, and the *delectus personæ* which is essential to form an ordinary partnership has no place in these mining associations; and there being no mutual confidence presumed, neither is the agent of the others nor has any power to bind the partnership by note, draft, borrowing money, or in any other manner, unless expressly authorized. Bissell v. Foss, 114 U. S., 260; Kahn v. Smelting Co., 102 U. S., 641; Skillman v. Lackman, 23 Cal., 198; Duryea v. Burt, 28 Cal., 569; Septembre v. Putnam, 30 Cal., 490; Taylor v. Castle, 42 Cal., 367; McConnell v. Denver, 35 Cal., 365; Jones v. Clark, 42 Cal., 180; Ricketts v. Bennett, 4 C. B., 686; Dickinson v. Valpy, 10 Barn. & Cres., 128; Burmester v. Norris, 6 Exch., 796.

*F. Charles Hume*, for appellees.—1. An ordinary partnership; Tiernan's powers as a partner not limited by the subject matter. Cothran v. Marmaduke, 60 Texas, 372, adopting Story on Part., sec. 58; Stevens v. Bank, 62 Texas, 501, 504, adopting Parsons on Part., 89, 90; Brinkley v. Harkins, 48 Texas, 225, 226; Rogers v. Nichols, 20 Texas, 723, 724; Burnley v. Rice, 18 Texas, 496, 497, adopting Story on Part., secs. 81, 82; Kimbro v. Bullitt, 22 How., 266, 268; 3 Miller's Dec., 326, 328, citing and explaining Dickerson v. Valpy, 10 Barn. & Cres., 138, relied on by appellants, and illustrating rule applicable in case at bar by approving reference to Thicknesse v. Bromilow, 2 Cromp. & Jarv., 425, where it is said that the mere fact that business consists in making profits out of real estate, as in working a stone quarry, will not take partnership out of the general rule of liability applicable to ordinary trading partnerships; Clagett v. Kilbourne, 1 Black, 347, 349; 4 Miller's Dec., 495, 496; Porter v. Graves, 104 U. S., 171, 172; Berthold v. Goldsmith, 24 How., 542, 543; 4 Miller's Dec., 265, 266, approving leading English case of Waugh v. Carver, 2 H. Blacks., 235; Beauregard v. Case, 91 U. S., 139 (partnership to lease and run railroad—the court holding it to be a common partnership if tested by the general principles of law, but an ordinary as distinguished from a commercial partnership when tested by the statute of Louisiana); 1 Smith's Lead Cas., part 2, 1298, 1308, giving result of authorities in notes to Waugh v. Carver, *supra;* Story on Part., secs. 27, 18, 24, 57 (note 1), 58 (notes), 82; 1 Coll. on Part., p. 687, note 3.

2. A partnership as to third persons; appellants liable though partnership unknown to appellees. Devine v. Martin, 15 Texas, 31; Ford

v. McBryde, 45 Texas, 499, 502, 503; Coons v. Renick, 11 Texas, 139; Strauss v. Jones, 37 Texas, 314; Stevens v. Bank, 62 Texas, 503, 504; Cothran v. Marmaduke, 60 Texas, 372, following Sheridan v. Medora, 10 N. J. Eq., 469, and Lengle v. Smith, 48 Mo., 276; Bradshaw v. Apperson, 36 Texas, 138; 1 Ct. App. C. C., secs. 505, 1221; 2 Ct. App. C. C., sec. 147; 3 Ct. App. C. C., sec. 262; Winship v. Bank, 5 Pet., 529; 9 Curtis' Con. Rep., 457, 466, 469—opinion by Chief Justice Marshall; 1 Smith's Lead. Cas., part 2, 1298, 1307; 1 Coll. on Part., sec. 405; Story on Part., secs. 53 (note 2), 56 (notes 2 and 3), 57 (notes), 58 (notes, especially citation from Chan. Walworth in Champion v. Bostwick, 18 Wend., 175), 59, 60 (notes, especially citation from Lord Eldon, in Ex Parte Langdale, 18 Ves., 300), 61 (notes, especially citation from Lord Ch. Just. Eyre, in Waugh v. Carver, 2 H. Blacks., 235, a case approved in Goldsmith v. Berthold, 24 How., 542, 543), 63, 102, 103, 108, citing Winship v. Bank, *supra;* 1 Coll. on Part., p. 643, citing Campbell v. Brown, 49 Ga., 417 (plantation partnership, where firm held liable, although plaintiff had been expressly notified not to give credit to the contracting partner).

3.   If not an ordinary partnership, yet all its members were bound to pay the account contracted by Tiernan.   Story on Part., sec. 82; 1 Coll. on Part., pp. 661 (citing Tredwin v. Bourne, 6 M. & W., 461, and Hawken v. Browne, 8 Id., 703), 687 (citing Thicknesse v. Bromilow, 2 Cromp. & Jarv., 425), 648; 2 Id., secs. 801, 805; Ralph v. Harvey, 1 Q. B., 845.

4.   Question of Tiernan's power to contract account for the jury. Crozier v. Kirker, 4 Texas, 257.

STAYTON, CHIEF JUSTICE.—Meredith & Ailman brought this action against Bernard Tiernan to recover $2815.67, which on his checks they had loaned to him during a period between October 20 and December 31, 1885.

They were bankers doing business in New Mexico, where Tiernan was engaged in developing a mine owned by Sawyer, Randall, Dyer, and himself in unequal shares.

The money was loaned to Tiernan, to whom alone credit was given, appellees not knowing that appellants were interested in the mining enterprise in which Tiernan used the money loaned.

The action having been brought against Tiernan alone, he suggested by pleading that Sawyer, Randall, and Dyer were equally liable with himself, and asked that they be made defendants.

They were cited before any amendment to the pleadings of the plaintiffs was made, and answered, and some question is made as to the regularity of the proceedings in this respect.

Meredith & Ailman amended their pleading on the coming in of the answer of Tiernan, and alleged that when they brought the action they

were not aware of any liability on the part of Sawyer, Randall, and Dyer, but then set up their liability as partners of Tiernan.

There was a judgment for the sum claimed against all defendants. That appellees loaned the money to Tiernan is not questioned, and that he used it in developing the mine owned by them is made clear.

It seems that the development of the mine began in 1883 and was continued until some time in spring of 1886.

It appears from the evidence of Tiernan and the other defendents that an estimate was made each year of the work that should be done and money expended, and that to meet this each contributed in proportion to his interest.

When the money thus contributed for the years 1883 and 1884 was expended, it seems that in accordance with agreement the work ceased. There, however, at the close of work in these years, may have been some indebtedness subsequently paid by defendants; whether such balances were for labor or materia or for borrowed money does not appear; nor does it appear what such balances were.

The statement of Tiernan in reference to that is: "When I needed money to continue the work I would notify my associates, when they would supply me with money, until this last indebtedness. Under the agreement or understanding I had with my associates I was to manage the workings of the mines and look after their interests out there generally. I had everything to do; no one had anything to do with it but myself. Prior to the accruing of the amount sued on I sometimes had occasion to procure advances out at the mines beyond the amount of money contributed by my associates for the advancement of the work. I don't know that I ever communicated that fact directly to my associates. I told them in a general way that I could get a few hundred dollars out there when I was short. There was nothing disapproved that I did. To pay the debts contracted in that way from time to time money was contributed by Captain Sawyer, Dr. Randall, and Mr. Dyer; those were the sources the money had to come from."

During the year 1885, prior to October 10, an indebtedness of $3700 was incurred in the work in excess of the sums provided for the purpose. At that time Tiernan was in Galveston, and according to his statement it was then agreed between the four persons interested that each would contribute in proportion to his interest to make up the sum of $5000, with which this indebtedness should be discharged and some other work agreed upon done. There is a conflict in reference to this matter between the evidence of Tiernan and Sawyer, the latter denying that he made any such agreement and the former stating that he did. All the parties except Sawyer furnished money in accordance with that agreement, but he did not. His share would have been $1406.25.

The indebtedness of $3700 seems to have been for wages of miners,

coal, wood, and other expenses of developing the mine, and was paid with money furnished under agreement of October 10, 1885.

The testimony of Tiernan is voluminous and shows that he had the entire supervision of the work; that he gave his personal attention to it for years, sacrificing his time and comfort to that end. Extracts from his letters, written during the year 1885, will illustrate the manner in which the business was conducted as well as the understanding of the parties as to the conduct of the business on a cash basis.

Sawyer seems to have been the correspondent from Galveston, and on May 23, 1885, he wrote to Tiernan: "I notice the work is using up your cash faster than you expected, and also what you say, that no provision has been made for other work than in the King mine cross-cuts, which is true. The objective point in your developments is to cut the vein or seam to the northwest of the deep shaft at the 150 feet level, or determine that there is no seam or vein there within a reasonable distance, and the means to do this is the $4000 raised and handed you and whatever you could make out of the ore on your dumps. I will inform our partners of what you write and your opinion as to stopping before you are satisfied about it. It might, perhaps, be prudent to concentrate your funds in the northwest cross-cut; but I am not authority, and can only say it was very inconvenient for me to put up the $1125 on my proportion of the $4000, and it becomes a very serious question about my being able to furnish another dollar this season, but I will consult our partners without reference to my own inability to furnish further means for any purpose."

In letter of date July 27, 1885, transmitting a part of $1500 which the parties had agreed to furnish in addition to the $4000 before referred to, Sawyer said: "You will please understand that we, Randall, Dyer, and myself, have in furnishing this last amount gone to the full extent that we will go in expenditures on the King group of mines at this time; and after disbursing this amount you will please make no further contracts or do any more work or make any further expenditures for our account."

In reply to this, on August 3, 1885, Tiernan wrote to Sawyer: "I am pegging away on the drift and cross-cut. As it takes some fuel, engines, and topmen to run one, I concluded that until I stopped for good it was cheaper to run both works at the same time. Ten or fiften feet may lead us to ore in the drift, and a change may take place in the cross-cut for the better. * * * I will send statement of expenses for month ending July 31. I firmly believe that we will get ore in the drift that will be some account and may bring us out all right. We can do this work for less money now than we ever can after stopping work by at least $66\frac{2}{3}$ per cent cheaper. It may take to the 10th of this month to determine. If nothing is found by that time to pay us, we close on the King mine for this year. * * * I trust this will be satisfactory to our partners all around. Our chances are good."

On July 30, 1885, Sawyer wrote: "I wrote you an official letter on 27th, which I trust reached you safely. While regretting that the pushing of the northwest cross-cut was not prosecuted in preference to any other work, and thereby solve the problem you intended to demonstrate when you left home, * * * still it has not been done, and if the money is exhausted which we and you have furnished for that purpose, and the proceeds of the ore on your dump is not sufficient to do it, it of course will not be done now; and, judging from what I know of myself and our partners, the only thing now and for some time to come is to lie still and to let the property lie still."

On August 7, 1885, he again wrote: "I have your favor of the 3d, and note carefully what you say in it, as well as from extended remarks of the 31st. My statements to you on the financial question were intended to make our conditions and intentions unmistakablé; and I now understand by your letter that if you do not meet with promised success by the 10th that you will close down."

On November 18, 1885, he wrote: "I tried in every way to prevent you from working on, and instructed you not to expend any money beyond the $1500 for our account, knowing well that I had no money and that my credit was strained; so you must do the best you can, inasmuch as you took the chances of expending the money against my protesting."

On November 28, 1885, Sawyer again wrote:

"Notice what you say about having prosecuted the work of development beyond the intention at the time you left last spring. I understand it as you do—that you took the chances, without authority from me and against my wishes and instructions, to expend more money for our account, and for the reasons given in your letters before me. I understand also my responsibility in the business, and will when I can do so without sacrifice of property or credit come up for what I am obligated for, but as I wrote you then I will repeat—I can not send you any money now. I stood in at the time for more than I could consistently do, and haven't yet paid that; so having taken the responsibility to expend the money, you must take care of it until I can reimburse you."

The following statement from brief of counsel, while not in all respects in the language of the witness nor entirely complete, is correct in reference to essential matters.

"Tiernan further says: October 10 there was a meeting at Sawyer's office, Dyer, Sawyer, and himself being present, and they agreed to go on with the $5000. 'It was to be the last, just like we had done at all other times. Gave Dyer a release October 10, 1885, stating, "From and after this date no installment or demand of any kind shall be made by me or through me, directly or indirectly, on Mr. I. Dyer, joint owner with S., R., and myself in certain mines in New Mexico, unless fully sanctioned by said I. D. in writing," etc. Said nothing to Dyer about assessments

of R. or S. He asked me something about Sawyer, but I don't recollect what it was. In 1883 and 1884 we closed up the mine for the season. In 1885 we kept right along. When I came to Galveston that trip $3700 was due to the miners for labor, and for wood and coal and all expenses at the mines. After I returned to the mines with such money as I had I commenced to do the usual work of developing the mines. I had a lot of miners that were running drifts. We run in on the southeast about fifty or fifty-five feet, on the northwest about eighty-five or ninety feet, to the northeast about eighteen or twenty feet, hoping to find ore. Still kept on with the black rock business to one hundred and twenty-seven feet. This work I speak of is what was done from the first. Don't know how much I did after I got back in October. After I got back I think on the contact I run in from eighteen to twenty feet. On the southeast drift I might have gone in about eighteen feet. The black rock was a cross-cut. Did some work on it, but can not say much much.

"'My share, $1675, was in bank bills. Suppose they were $5, $10, or $20 bills. I got the money out of my business in Galveston, not out of a bank. I don't remember what Sawyer's excuse was for not paying his share. I think he said he could not pay it. I went on and collected the other shares. I don't think I mentioned to the other parties that Sawyer said he could not pay his share. At the meeting Sawyer was chairman. Of course he was to pay. Afterwards, when I went to collect the money, he said he would not pay. The receipts given to Dyer and Randall, dated October 10, signed by Sawyer, express that the amounts are for expenses already incurred, and for running a drift about twenty feet, and doing assessment work on four claims at Eureka, the aggregate expense of which is $5000.' Repeats statement of the meeting on October 10 between Sawyer, Dyer, and himself, and agreement each to contribute his proportion of $5000. 'Afterward Sawyer told me he would not pay his portion. I think it was at the time he wrote me the receipts for Dyer and Randall. I think it was down-stairs he told me. I think it was the same day of the meeting; all finished up that day, October 10. Sawyer told me he would pay no more. I most certainly did contribute my own share. Sawyer has never paid his $1406.25. I applied what I collected to the debts and for the general use of the King mine. I did not have any left for continuance of the work, because Sawyer had not come up with his share. I, however, still went on with the work. I got the money from Meredith & Ailman. They paid the checks, and that is how the debt originated. As I did not have S.'s part, I went to the bank and got advances from M. & A. The money I got from them was expended on the mine for the general account of us all.'

"Sawyer testified: 'It was agreed at a meeting of us four—Randall, Tiernan, Sawyer, and Dyer—that in the event of a purchase of King's interest we would, in addition to the amount paid for King's interest,

furnish $10,000 for machinery, etc., for developing this mine, and inasmuch as Mr. Tiernan had reported that surface development work was nearly exhausted upon the King mine, that a test of its value should be made by sinking a shaft of 250 feet; $10,000, in Tiernan's judgment, was sufficient to perform this work. It was further agreed in that meeting, as it was at every subsequent meeting, that a certain amount of work was to be done the succeeding season, and that the $10,000 was all that was to be expended; and I went into it on that basis. I told Tiernan, and he understood very clearly and distinctly, that while I put that money in the King mine as an investment, that I did not put anything into mines that I could not afford to lose, and that my proportion of $10,000 was as much as I could stand. We accepted his judgment as to the proper course to pursue and the proper work to be done, and he made an estimate in every instance of what it would cost, and then we agreed upon it, or did not agree, as the case might be. When the amount was about exhausted Tiernan, recognizing his obligation to cease work on the property when directed, came home. That was October, 1883.'

"That winter they agreed with the Massachusetts Company, owning an adjoining mine, to put in $6000 to go down to a level of 400 feet—the Massachusetts Company to pay $2000, the others their proportion. The Massachusetts Company failed to pay. Tiernan was very confident that by spending $4000 more they would succeed, and then appellants agreed to advance, and did advance, their proportion of that sum, but it also proving a failure they refused to furnish more money, and Tiernan came home in October, 1884.

"'In the spring of 1885 it was determined to run a cross-cut from 150-foot level in the deep shaft. We had three meetings about that before we decided to do anything about it. Tiernan thought he could raise $3000 out of the dump ore, and we decided to raise $4000. Afterward we decided to raise $1500 more, and notified him that was all he should expend for our account. In 1883 and 1884 when we told him to stop work he complied, but in 1885 he did not. He gave his reasons for not stopping the work, and went on with it, notwithstanding our requests to stop and protests not do any more on it. Tiernan came to Galveston in October, 1885. My recollection of the meeting of October 10 is different from Mr. Tiernan's. We had no meeting then. Mr. Tiernan came down to the office and saw me, and told me he had done this work and it had to be paid for, and that he owed so much money up there, and that he required $5000 to pay the debts and do the work that remained to be done. I told him that I had written to him that I had put in as much money as I could that season, and could not put in any more. He was earnest and vehement, and became warm. A day or two after that he told me that Randall and Dyer were willing to put in their proportion of the $5000. I told him I could not and would not put in any more; if R. and D. wanted to conitnue

this work I would not influence them or stand in their way; I was going to New York. He said he wanted these proportions passed through the same channel they always had, and asked me to write the receipts and he would collect the money from R. and D. That was carried out, and he went up to the mines, and he continued to work on and to report to me what he was doing from time to time. He wrote me he was doing the work on his own responsibility; if he struck rich ore everything would be overlooked; if he did not strike paying ore he expected to suffer for it. When he came back the last time he said I would have to pay my proportion of the work that had been done, and that the courts would make me do it. I told him if he was going to take it into the courts let us have no more conversation about it. He said he had heard from his foreman and that he was getting out some very rich ore. I said: "You are not working on my account," and he said no, but on his own.

"'From the time of the purchase of King's interest in the King grant T. has received from D. $9356.87, from R. $10,174, from me $10,335.90, less $2500, cost of machinery paid for by me. During all that time he has never rendered a statement, a voucher, or figures, except as to his indebtedness and the money he wanted. Mr. T. was entrusted to do the work up there according to his judgment, up to the amount of money we agreed to furnish each year upon his estimates, and he was not to exceed that. He understood from me personally and from the others that was all we would be willing to expend during the season succeeding. If the mine showed up well, all right, but not to go beyond what we agreed upon. These were not the words but that was the understanding. There was never any letter written by me or any authority given him to make any debts or borrow any money on my account, and I am pretty sure there was no such authority from R. or D. Prior to commencing the season's work we all had a meeting and his views were formally presented. His estimates showed it would take so much money to do so much work. Then the question was whether we would or could contribute the necessary funds. We would finally agree upon the amount of work and the manner in which it was to be done. He could change the manner of the work when he got there until the level was reached or the money exhausted we had agreed to put in. The transactions were cash. He had no authority to go beyond the agreed amount of money to be expended. He certainly had no authority to borrow money for my account, and to my knowledge he had no such authority from the others.'

"E. Randall testified: · 'Every year when Mr. T. came down we got together early in the spring and agreed upon the work to be done and the amount of money we would contribute. It was the understanding between us all that that was to be the limit. It was plainly understood that he was not to go beyond what was agreed upon. I never gave him any authority to borrow money on my account. It was the understand-

ing everything was to be done on a cash basis.   There was to be no credit at all.   Of course, as in all transactions, the work might overrun the estimates a little, and when Mr. Tiernan came home at the close of the season we agreed to pay up what was owing.   He obeyed instructions in 1883 and 1884 to stop work, but in 1885 he continued on with the work, and came down here and we told him distinctly it did not make any difference what was ahead, we were not going to spend another dollar, and that I for one could not raise the money.   There was no man on earth that had authority from me to make a single dollar credit on my account. He said he owed so much money up there at the mine, that they were rough fellows, and a man should always pay his debts promptly, and he wanted to come out of the mine perfectly clear of debt.   Tiernan came to see me on October 10, stating that he had been to Mr. Sawyer and to Mr. Dyer, and there had been an agreement to pay off this debt, raise $5000, pay off ever cent we owed, and do a little more work that would be more satisfactory to have done, and he could come out of the mountains not owing a cent.   He said Sawyer had left that day and had given him two receipts, one to Dyer for his money and one to me.   From the conversation of Tiernan I was led to believe that Sawyer had paid his proportion and Dyer his.   I agreed to pay my proportion of the $5000. In the above time I have never seen a statement of account from him, except of what money he wanted to carry on the work with.   I asked him for a statement and to keep books of accounts and show his expenditures.'

"I. Dyer testified:   'When I entered this business I understood it was to be a strictly cash affair, and "pay as you go."   I was always willing to pay my proportion when the others agreed to anything, but I did not want any credit business.   We furnished him with the means, as stated by the other witnesses, to carry on the work, and I believe what they have stated was about what was done.   In October, 1885, when he came down I declined to pay any more.   As there was $5000 to be raised to pay off what was owing at the mines and to conclude some little work to be done, I agreed to contribute my proportion, $781.25 I think, but with the distinct understanding that I was not to be called upon for any more, and should be entirely released.   Tiernan said he was sick of the business and did not intend to do any more work, and I understood from him distinctly the $5000 was to pay everything and do what work was to be done.   Mr. Tiernan has stated that previous to October 10, 1885, when he came down here there was a meeting held at which I was present.   If there was any such meeting I know nothing of it.   It has certainly escaped my memory. I think I would remember it were there such a meeting.   I supposed when I paid my proportion Mr. Sawyer had or would pay his.   Subsequently I heard Sawyer say he would not pay it.   The receipt was delivered me by Tiernan.   Said he was anxious to get the money and get away

and was collecting it himself. I did not see Sawyer on that day or for several days previous. I was not at any meeting that might have been held previous to that. If there were any losses I was to pay my proportion of such losses. I did not consider I was a partner in any concern, but I considered I owned a certain interest with the other three, and I did not consider there was any partnership further than that. None of these gentlemen had authority to trade on my credit for anything, or represent me in borrowing money for that mining business or anything else. I never held myself before the world as a partner in this business. As I stated before, I went into it on a cash basis, and would not consent to any credit business.' "

Every item sued for is for money loaned and interest thereon and protest fees of bill of exchange.

While the manner in which appellants were brought before the court may have been irregular, yet they answered, and the cause was not tried until a succeeding term, which cures any irregularities that may have occurred.

The vital questions involved in this cause arise mainly on assignments of error which question the correctness of the court's rulings in giving and refusing instructions.

After instructing the jury as to the facts which would constitute a partnership, and as to the liability of members of trading partnerships, the court gave the following charges:

"But in mining partnerships the acts of one partner, to be binding upon the other copartners, must be shown by proof to have been done in the usual course of the business, or necessary for carrying on the business of the partnership. To constitute either a commercial partnership or a mining partnership it is necessary that the parties be entitled to share in the profits of the business and be sharers in the business losses.

"If you believe from the evidence that the defendants purchased the King mine grant jointly, each acquiring a certain proportion of the whole, and that after said purchase they held said property jointly, each owning and holding certain proportions of the whole, and if you believe from the evidence that they held said property with the agreement and purpose to work said mine for profit, each to share in his proportion in the profits to be derived from the work, then the defendants would be mining partners in such property and in such mining adventure, and would be liable for debts necessary to be incurred in carrying on said work and for losses necessarily incurred in the prosecution of said work.

"If you believe from the evidence that the defendants were mining partners, and that Tiernan was the acting managing partner, having charge of and directing the work, and that the account sued on was incurred by him, acting as such partner, in conducting the work or in paying the expenses thereof, and such work was done in the usual course of business

or was necessary for the conduct of the partnership business, then you will find for the plaintiffs.

"If the defendants were mining partners as aforesaid when Tiernan incurred the indebtedness sued for by plaintiffs, and said indebtedness was contracted by him for and on account of the mining work done by him for himself and associate codefendants as partners, and if such work was done in the usual course of the business, all and each of the defendants are liable to the plaintiffs for the proven amount of the account sued on, with eight per cent interest, calculated as aforesaid; and this would be so though the evidence should show that Tiernan's codefendants had instructed him from the doing on their account of the work, or the incurring on their account of the expenses to pay for which the account sued on was contracted, even though the plaintiff in making the advances may not have known who composed the partnership and may not have known that any partnership existed, and although the partner obtaining such advances obtained them in his own name, and without disclosing the names of his partners, and without discovering the fact that there were partners; and although in obtaining such advances said partner Tiernan may have violated his express and written promise to his partners that he would not incur such liability, and in violation of his express and written promise to his partners that they should not be called on for money to carry on said business, unless the party making such advances had knowledge or notice at the time of making the same of such promise or agreement."

It is urged that the court erred in giving these charges, and in refusing to give the following:

"If the jury believe from the evidence that B. Tiernan and the other defendants agreed with each other to purchase the interest of King in the King mines and to develop the same, each of the defendants agreeing to pay a certain amount in proportion to the interest held by him in the purchase so made, and it was further understood that the purchase of the mines was to be made for cash and that all work was to be done for cash, and that when the cash so furnished was spent the work was to stop, then neither, without express authority, would have the right to borrow money or incur any liability which would be binding on the other owners.

"If the jury believe that Meredith & Ailman agreed to lend the defendant Tiernan the money sued for in this action upon the individual responsibility of Tiernan, and they were ignorant of the connection and the names of the other defendants, they can not recover of such other defendants without showing affirmatively that Tiernan had authority from the defendants to borrow money on the credit of the defendants for the business in which they were engaged."

The conclusion of the charge given was: "But unless you believe from the evidence that the defendants were mining partners as aforesaid, the verdict should only be against the defendant Tiernan, and unless you

believe from the evidence that the work for which the indebtedness accrued was necessary for the carrying on of the business, or was in the usual course of the business, the verdict should be only against the defendant Tiernan for such of the account as is proven."

Under the uncontroverted facts it must be conceded that appellants are not liable by reason of holding themselves out to be partners of Tiernan, for appellees did not give credit upon the faith of the existence of a partnership, but to Tiernan alone, not knowing of the partnership. It must further be conceded that Tiernan was not expressly given power by his associates to borrow money to be used in the mining enterprise.

If it be conceded that a partnership existed between Tiernan and his associates, it is clear that he had only such powers as are to be implied from the nature of the business in which they were engaged. Between partners themselves and between the firm and persons dealing with the firm it must be presumed that each partner is the agent of the firm, empowered to carry out its objects and transact the business for which the partnership was formed in the usual and customary way pursued by other firms engaged in a like business; and in the absence of restrictions on this power rights must be adjusted in view of its existence.

Third persons dealing with a member of a firm in reference to partnership matters, in the absence of power expressly conferred, must recognize the fact that the partner's power to bind his firm is restricted to the doing of such things as are within the scope of the particular business. Between the partners themselves and between the firm and persons dealing with it through a partner, there is no doubt that the usages of firms engaged in the same character of business in the same country, as well as the general usage of the firm in the conduct of its business, may be looked to to ascertain the implied powers possessed by a partner.

If the power exercised in a given case be one usually exercised by partners in a like business, all the members of the firm must be supposed to have intended to confer a like power on each other. If the power be habitually exercised by a partner and acquiesced in by the other members of the firm, it is but fair to conclude that the members of the firm intended it to be exercised.

There is no evidence in this case, however, which shows that it was usual for one member of a mining firm to borrow money; nor is there evidence that, within the knowledge of appellants, Bernard Tiernan had ever borrowed money for partnership purposes before he borrowed the money from appellees. There is no evidence that he had before borrowed money, with or without the knowledge of his copartners, for partnership purposes; but were it otherwise, as he borrowed the money in the face of positive knowledge that his partners did not desire this to be done, they would not be responsible to him for it, although it may have been used, without their knowledge, for partnership purposes; hence appellees can claim nothing

through rights he might have had if he had borrowed the money in pursuance of a course of business theretofore recognized by his associates.

If Tiernan had not the implied power to borrow money, resulting from the nature of the enterprise in which he and associates were engaged, then appellees had no just claim against the latter; and the usual course of business of such partnerships, or of this particular firm, could have no bearing on any question involved in this case except to furnish the measure of the implied power held by him.   To the extent of such power possessed and exercised by him all other partners are bound, whether appellees knew or did not know of the existence of the partnership when they loaned the money.

It is well settled that members of trading partnerships have power to borrow money to be used for partnership purposes, and it is as well settled that members of what are termed nontrading partnerships have not such implied power.

There is some difficulty in determining in all cases whether a partnership belongs to the one class or the other.

In Kimbro v. Bullitt, 22 Howard, 268, it was said that "whenever the business, according to the usual mode of conducting it, imports in its nature the necessity of buying and selling, the firm is then properly regarded as a trading partnership and is invested with all the powers and subject to all the obligations of that relation."

A recent writer suggests, perhaps, a fuller definition, as follows:  "If the partnership contemplates the periodical or continuous or frequent purchasing, not as incidental to an occupation but for the purpose of selling again the thing purchased, either in its original or manufactured state, it is a trading partnership; otherwise it is not."   Bates' Law of Part., 327.

There is no doubt that all partnerships which fall within this definition are trading partnerships, and it may be that it is broad enough to cover all that should be so classed.   If there are those not embraced within this definition, in which each partner is clothed with power to borrow money, they may be recognized by the character of the business pursued, which makes frequent resort to borrowing a necessity not existing by reason of embarrassment or on account of some fortuitous event, but for the advantageous prosecution of even a prosperous business.

It has been generally held that mining partnerships are nontrading partnerships, and the individual members of the firm without power to borrow money on the credit of the firm, unless the power be given otherwise than by implication for the ordinary nature of the business.   Bates' Law of Part., 329, 371; Lind. on Part., 266, 270; Coll. on Part., 658, 686, note 2; Pars. on Part., 108, 218, and note; Story on Part., 126; Story on Con., 279; Dan. on Neg. Inst., 357, 359.

These authors as well as brief of counsel cite many cases bearing on

the question. The evidence in this case shows at least a prima facie want of power in Tiernan to borrow money for the firm.

The first part of the charge given informed the jury that to make the act of one member of a mining firm binding on it the act must have been done in the usual course of business.

This was correct; but the charge went further and informed the jury that this or another state of facts must have existed to fix the liability, which was that the act must have been "necessary for carrying on the business of the partnership."

This carried the implication that the act of the partner bound the firm if it was necessary for carrying on the business.

An act may be necessary for the carrying on of the business of a partnership, but when done by one partner the firm can not be bound by it unless he has express or implied power to do the act.

Whether he has the implied power, depends on whether the act be "necessary to carry on the business in the ordinary way. A partner's power is to do only what is usual, and not what is unusual because necessary." Bates on Part., 320.

This charge was objectionable for the further reason that there was no evidence from which the jury would have been authorized to find that it was usual for such firms to borrow money.

The second paragraph of the charge given was subject to a like objection.

The third paragraph, in effect, informed the jury that appellants would be liable if the "work was done in the usual course of business, or was necessary for the conduct of the partnership business," provided the "account sued on was incurred by him (Tiernan) acting as such partner in conducting the work or in paying the expenses thereof."

Whether the work was done in the usual course of business or was necessary was not the inquiry to which the mind of the jury should have been directed.

The work may have been done in the usual course of business or necessary, but this would not confer on the partner power to borrow money to pay for it, unless the exercise of that power was usual in the ordinary conduct of such a business.

The fourth paragraph on the same subject was still more objectionable. The first part of that was: "If the defendants were mining partners as aforesaid when Tiernan incurred the indebtedness sued for by the plaintiffs, and said indebtedness was contracted by him for and on account of the mining work done by him for himself and associate codefendants as partners, and if such work was done in the usual course of the business, all and each of the defendants are liable to the plaintiffs for the proven amount of the account sued for."

Thus the simple fact that the work may have been done in the usual

course of business was declared to fix on appellants liability if the indebtedness was contracted on account of the work.

The instruction contained in this and the preceding paragraph would have been correct had the defendants composed strictly a trading partnership for whose use the money was borrowed; but assuming as they did that liability existed if the money was borrowed and spent on work done in the usual course of business, they were erroneous when applied to a nontrading partnership.

They assumed the implied power to borrow money to exist, because work done in the usual course of business may have been paid for with money borrowed.

The last paragraph in the charge given has the vices of all the others. If a partner be not given express power to borrow money, and the business or course of business of the firm or like firms be not such that therefrom such a power may be implied, then there is no reason for holding a firm bound for a loan made to and on the sole credit of one partner simply because he may have used the money for a partnership purpose.

No facts being shown from which it could have been found that Tiernan had implied power to borrow the money for the firm, the court with propriety might have given the first charge requested and refused, while under a different state of facts to have given the charge would have been erroneous.

The second charge asked and refused might with propriety have been given for the same reasons, while had there been evidence from which power in Tiernan to borrow money might have been implied, it would have been erroneous to have given the charge unless the jury had been informed how it might be "affirmatively shown that Tiernan had authority from the defendants to borrow money."

This case well illustrates the importance of denying to partners in mining enterprises the power to borrow money on the credit of the firm unless the power be expressly conferred by the other partners or fairly may be implied from the usual course of business.

Appellants had emphatically refused to furnish more money for the prosecution of an enterprise success in which, of all classes of enterprise, is most doubtful. They had furnished as much as they were willing to stake on the venture, yet the claim is that the one partner had the implied power to compel them to go further without proof of any fact tending to show that the partners could have intended this, or that third persons could have believed that they so intended.

We have not deemed it necessary to consider whether there is anything in the peculiar relations between mining partners which should influence the decision of this case, but have considered it solely from the standpoint of a nontrading partnership.

. For the errors noticed, the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Delivered March 29, 1890.