**William G. BURNS, d/b/a International Advertising Agency, Appellant,**

v.

**Arturo C. GONZALEZ, Appellee.**

No. 14658.

Court of Civil Appeals of Texas.

San Antonio.

March 12, 1969.

Rehearing Denied March 12, 1969.

W. R. Smith, San Antonio, for appellant.

Arturo C. Gonzalez, Del Rio, for appellee.

CADENA, Justice.

Appellant's motion for rehearing is overruled. However, the following is substituted for the opinion heretofore filed herein.

Plaintiff, William G. Burns, sued Arturo C. Gonzalez and Ramon D. Bosquez, individually and as sole partners in Inter-American Advertising Agency (herein called "the partnership"), to recover on a $40,000.00 promissory note executed by Bosquez in his own name and in the name of the partnership. After an interlocutory default judgment had been entered in favor of plaintiff against Bosquez, the trial court, sitting without a jury, entered the judgment appealed from, denying Burns any recovery against Gonzalez.

The sole business of the partnership was the sale, on a commission basis, of broadcast time on XERF, a radio station located in Ciudad Acuna, Mexico, and owned and operated by a Mexican corporation, Compania Radiodifusora de Coahuila, S.A. (herein called "Radiodifusora"). Bosquez and Gonzalez each owned 50% of the Radiodifusora stock, with Bosquez acting as president of the corporation.

The events culminating in this litigation began in 1957 when a written contract was entered into between Radiodifusora and the partnership, on the one hand, and Roloff Evangelistic Enterprises, Inc., and Burns, on the other. Under this contract, Radiodifusora and the partnership, in consideration of the payment of $100,000.00 by Roloff and Burns, agreed to make available to them two 15-minute segments of broadcast time daily over XERF so long as the franchise of the radio station remained in force, beginning July 1, 1957. In accordance with the terms of the contract, Roloff and Burns paid the $100,000.00 in four equal installments on July 1, 1957,

November 1, 1957, March 1, 1958, and July 1, 1958, with Burns retaining 15% of such payments as his commission, as he had a right to do under the terms of the contract.

Subsequently, Roloff assigned all of its rights under this contract to Burns, effective June 16, 1962. Both Radiodifusora and the partnership approved such assignment.

Because of labor disputes and other circumstances, the radio station was shut down at various times. With some exceptions, the broadcast periods described in the 1957 contract were not made available to Burns or to persons to whom he sold such broadcast periods, after June 16, 1962.

On November 28, 1962, Bosquez, purporting to act on his own behalf and on behalf of the partnership, executed the note in question, payable to Burns on November 28, 1964. According to a separate instrument signed by Bosquez on the same date, the radio station was in receivership and it was unlikely that the broadcast periods to which Burns was entitled under the 1957 contract would be made available to him for the two-year period ending November 28, 1964, the date on which the note was payable. This instrument recited that since Burns would derive an income of $20,000.00 a year from sale of such broadcast periods, the note in the amount of $40,000.00 had been executed and delivered to Burns to compensate him for the income which he would have derived during the two-year period ending November 28, 1964.[1] Bosquez testified, and Burns does not deny, that "one of the reasons" why he executed the note was the promise by Burns not to sue Radiodifusora.

The next relevant instrument is dated May 24, 1963. It is a contract between Burns and Bosquez, who purported to act on behalf of Radiodifusora and the partnership. The preamble to this agreement refers to the 1957 contract, the assignment of Roloff's rights thereunder to Burns, the approval of such assignment by Radiodifusora and the partnership, and the breach of such contract. No mention is made of the 1962 note. After this reference to the prior course of dealings between the parties, the agreement recognizes the rights of Burns under the 1957 contract, and Radiodifusora agrees to make the broadcast periods described in that contract available to Burns beginning September 1, 1963. As consideration for this promise by Radiodifusora, Burns agreed to pay to Radiodifusora one-half of the amounts realized by him from sale of such time, and agreed not to file suit against Radiodifusora. The contract concludes with the recital that all understandings between the parties had

1. Although the note, according to the testimony of Bosquez and Burns, was given to compensate Burns for loss of income resulting from nonavailability of time during the two-year period ending November 28, 1964, Burns nevertheless, after the execution of the note, made repeated demands for delivery of the time, threatening to file suits in both American and Mexican courts if necessary. Even a casual reading of the testimony makes it apparent that Burns did not acknowledge that, by accepting the 1962 note, he had waived his rights to broadcast time during the two-year period.

Another unusual feature of the case is that on July 29, 1964, some three months prior to the maturity date of the note, Burns filed suit against the partnership, Radiodifusora, and others seeking damages for breach of the 1957 contract. At this time, of course, if the accounts of Burns and Bosquez relating to the circumstances surrounding the execution of the note are true, Burns was not entitled to any time on XERF. Interestingly enough, in the petition filed by Burns in that case, he sought to recover for the failure of the radio station to air his programs during the period covered by the note. It was not until January 24, 1967, after this Court had ordered the suit transferred from Bexar County to Val Verde County, Gonzalez v. Burns, Tex. Civ.App., 406 S.W.2d 527 (1966, no writ), that Burns amended his pleadings in that case abandoning his claim for damages resulting from defendants' failure to make broadcast time available during the two-year period for which he had been supposedly compensated by the note.

been reduced to writing and were embodied therein.

Although Gonzalez denied under oath the authority of Bosquez to execute the 1962 note, the trial court held that the note was an obligation of the partnership. The judgment in favor of Gonzalez was based on the theory that he had been relieved of liability on the note as a result of the 1963 agreement.

In the discussion which follows, the term "U. P. A." will be used to refer to the Texas Uniform Partnership Act, Vernon's Ann.Civ.St. Art. 6132b.

■ Under Sec. 9(1), U. P. A. "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, *for apparently carrying on in the usual way the business of the partnership* of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." (Emphasis added.) In this case, in fact, Bosquez had no authority to bind the partnership by executing a negotiable instrument. But, since this express limitation on the authority of Bosquez was unknown to Burns, then, under the language of Sec. 9(1), his act in executing the note would bind the partnership if such act can be classified as an act "for apparently carrying on in the usual way the business of the partnership."

As we interpret Sec. 9(1), the act of a partner binds the firm, absent an express limitation of authority known to the party dealing with such partner, if such act is for the purpose of "apparently carrying on" the business of the partnership in the way in which other firms engaged in the same business in the locality usually transact business, or in the way in which the particular partnership usually transacts its business. In this case, there is no evidence relating to the manner in which firms engaged in the sale of advertising time on radio stations usually transact business. Specifically, there is no evidence as to whether or not the borrowing of money, or the execution of negotiable instruments, was incidental to the transaction of business, "in the usual way," by other advertising agencies or by this partnership, Inter-American Advertising Agency. It becomes important, therefore, to determine the location of the burden of proof concerning the "usual way" of transacting business by advertising agencies.

■ Sec. 9(1) states that the act of a partner "for apparently carrying on in the usual way the business of the partnership" binds the firm. This language does not place the burden of proof on the non-participating partner to establish the non-existence of the facts which operate to impose liability on the firm. If the Legislature had intended to place the burden of proof on the non-participating partner, it could have done so easily. The statute could have been drafted to declare that the act of a partner binds the firm "unless it is shown that such act was not for apparently carrying on in the usual way the business of the partnership." Actually, the liability-imposing language of Sec. 9(1) indicates that the burden of proof is on the person seeking to hold the non-participating partner accountable. It is not couched in terms appropriate for the establishment of a presumption, "administrative" or otherwise. The language relating to carrying on in the usual way the business of the partnership is no more than a statement of the rule concerning vicarious liability based on "apparent" authority.

Under Rule 93(h), Texas Rules of Civil Procedure, a defendant must support by affidavit a denial of execution by himself or by his authority of any written instrument upon which plaintiff's demand is based. But a sufficient sworn denial, such as that filed by Gonzalez in this case, im-

poses upon a plaintiff the burden of establishing its execution by defendant or by one authorized to bind him. 2 McDonald, Texas Civil Practice (1958), § 729, p. 262.

■ We conclude that, under a reasonable interpretation of the language of Sec. 9(1), and the provisions of Rule 93(h), the burden of proving the "usual way" in which advertising agencies transact business was upon Burns.

■ Our conclusion is supported by the fact that the liability of partners with respect to third persons is largely determined by reference to the principles of the law of agency. Restatement 2d, Agency Sec. 14 (1958); U. P. A., Sec. 4(3). One who asserts that the particular act of an agent is within the scope of the agent's authority has the burden of proving the extent of such authority. Amerada Petroleum Corp. v. Mexia Big Pool Royalty Co., 220 S.W.2d 497 (Tex.Civ.App.—San Antonio 1949, writ ref'd n. r. e.). We recognize, of course, that there are aspects in which the partner-agent differs from the "ordinary" agent. But we know of no distinction which compels application of different rules concerning the burden of proof in connection with establishment of the extent of the agent's power. The principle for imposing liability on the non-acting party, be he partner or ordinary principal, is that he has "held out" the actor as being empowered to perform acts of the nature of the act in question. If A seeks to impose liability on B for the act of C on the theory that B held C out as having power to do such act, clearly the burden of establishing the facts which constitute such holding out is on A.

■ In the case of an ordinary agent, "holding out" is established by showing that the principal placed the agent in a position which ordinarily carries with it generally recognized powers. The agent will then have, as far as third parties are concerned, the power to do the things ordinarily done by one occupying such a position, unless the third party has knowledge of limitations on the powers of the agent. In Collins v. Cooper, 65 Tex. 460, 464 (1886), the Supreme Court said that in determining the extent of an agent's power, it "becomes necessary, to consider the character of the business, the manner in which it is usual to carry on such a business, and, where the agency has continued for a long time, the manner in which the particular business was carried on, * * *." This is the same principle which is made applicable to problems concerning the power of partners by Sec. 9(1).

There are many statements to the effect that members of a "trading" partnership have implied authority to bind the partnership by issuing commercial paper, while members of a "non-trading" partnership have no such implied authority. 3 Tex.Jur. 2d, Partnership, § 86, pp. 412, 413. But we do not base our holding on the ground that the partnership here was of the non-trading type. It is apparent that the attempted distinction between the two types of partnership is nothing more than a shorthand rendition of the notion that B is liable for the act of C if B has "held out" to other persons that C is empowered to perform acts of that particular nature. The nature of the distinction is revealed by the language of Chief Justice Stayton in Randall v. Meredith, 76 Tex. 669, 13 S.W. 576, 582–583 (1890): " 'If the partnership contemplates the periodical or continuous or frequent purchasing, not as incidental to an occupation, but for the purpose of selling again the thing purchased, either in its original or manufactured state, it is a trading partnership; otherwise, it is not.' * * * There is no doubt that all partnerships which fall within this definition are trading partnerships, and it may be that it is broad enough to cover all that should be so classed. If these were not embraced within this definition, in which each partner is clothed with power to borrow money, they may be recognized by the character of the business pursued, which makes fre-

quent resort to borrowing a necessity, not existing by reason of embarrassments, or on account of some fortuitous event, but for the advantageous prosecution of even a prosperous business. * * *

" * * * An act may be necessary for the carrying on of the business of a partnership, but when done by one partner the firm cannot be bound by it, unless he has express or implied power to do the act. Whether he has the implied power depends on whether the act be 'necessary to carry on the business in the ordinary way. A partner's power is to do only what is usual, and not what is unusual because necessary.' * * *

" * * * Whether the work was done in the usual course of business, or was necessary, was not the inquiry to which the mind of the jury should have been directed. The work may have been done in the usual course of business, or necessary, but this would not confer on the partner power to borrow money to pay for it, unless the exercise of that power was usual in the ordinary conduct of such a business."

It appears that the tests announced in Randall for determining whether a partnership is to be classed as trading or nontrading is exactly the same test for imposition of liability embodied in Sec. 9(1). This explains the fact that the U. P. A. makes no mention of the distinction between trading and non-trading firms.

■ We are aware of the language in Crozier, Rhea & Co. v. Kirker, 4 Tex. 252, 258–259 (1849), to the effect that every partner has implied power to bind his co-partners by executing notes for commercial purposes consistent with the object of the partnership. Similar language is found in Brewer v. Big Lake State Bank, 378 S.W. 2d 948, 951 (Tex.Civ.App.—El Paso 1964, no writ), and Ft. Dearborn Nat. Bank v. Berrott, 23 Tex.Civ.App. 662, 57 S.W. 340, 341 (San Antonio, 1900, no writ). But in each of these cases the partnership business contemplated "the periodical or continuous or frequent purchasing, not as incidental to an occupation, but for the purpose of selling again the thing purchased." Where the partnership business is of that nature, it is usual and customary to purchase on credit and to execute paper evidencing the existence of the partnership debt. That is, to use the language of Sec. 9(1), in such partnership, "carrying on in the usual way the business of the partnership" involves borrowing and the issuance of commercial paper. Or, to use the language of Randall, the nature of such a partnership "makes frequent resort to borrowing a necessity, not existing by reason of embarrassments, or on account of some fortuitous event, but for the advantageous prosecution of even a prosperous business." The statements in Crozier, Brewer and Berrott relating to implied authority of a partner to issue negotiable paper must be construed as being applicable to the types of partnerships there involved. If not so limited, then the assertions that every partner has implied authority to bind the firm by executing negotiable instruments must be disregarded as incorrect, irreconcilable with the analysis of the problem in Randall, and inconsistent with the plain language of Sec. 9(1). The power of a partner to issue commercial paper arises not from the existence of the partnership, but from the nature of the partnership business and the manner in which such business is usually conducted. This is the plain meaning of Sec. 9(1).

The only thing we know of the nature of the partnership here is that it was restricted to the sale of broadcast time over XERF on a commission basis. There is nothing to show that the transaction of such business required "periodical or continuous or frequent purchasing" or made "frequent resort to borrowing a necessity, not existing by reason of embarrassments, or on account of some fortuitous event, but for the advantageous prosecution of

even a prosperous business."[2] The assets of the partnership consisted of a few desks, chairs, typewriters and office supplies.

We disagree with the contention put forward by Burns to the effect that Bosquez was the managing partner. At best, the record reflects that both Bosquez and Gonzalez were active in the management of the business. As a matter of fact, with the exception of the transactions involving the 1962 note and the 1963 agreement, the record discloses that all instruments significantly affecting the relations between the partners and Burns were signed by both Bosquez and Gonzalez.

■ Since the evidence does not disclose that Bosquez, in executing the 1962 note, was performing an act "for apparently carrying on in the usual way the business of the partnership," there is no basis for holding that the note sued on was a partnership obligation.

■ Since Burns filed no pleadings alleging that Gonzalez had ratified the act of Bosquez, or that Gonzalez had been guilty of any acts giving rise to an estoppel, it is not possible to hold Gonzalez liable on any theory of ratification or estoppel. Cassidy Commission Company v. Security State Bank, 333 S.W.2d 454, 458 (Tex.Civ.App.—

Houston 1960, no writ); Midsig Corporation v. Dickson, 271 S.W. 654 (Tex.Civ. App.—El Paso 1925, no writ).

The judgment of the trial court is affirmed.

2. Bosquez, after testifying that he had never borrowed money or executed notes in the name of the partnership, qualified this answer by saying that he was not sure, adding, "I may have signed one or two." He then said that he had borrowed money from a bank in the name of the partnership, but he could not remember when.

When asked whether he had signed, in the partnership name, any note payable to Burns, other than the 1962 note, Bosquez answered: "I believe that he advanced some money to the station one time, * * * and we did sign a note to him." He added, "I don't remember, but I believe we did, because he used to advance money for radio time." According to Bosquez, if any such notes were signed, they would be in the possession of Burns and would bear the signatures of both partners. Burns produced no such notes.

Even if this testimony is sufficient to establish that Bosquez borrowed money from the bank once, there is no evidence indicating that Gonzalez knew of such transaction. And, assuming that money "advanced" by Burns for radio time could be treated as a loan, rather than as advance payment for radio time purchased (as the record indicates was the case with payment for the time segments involved in the 1957 contract), the testimony is insufficient to establish that the nature of the partnership business was such as to make "frequent resorts to borrowing a necessity, not existing by reason of embarrassments, or on account of some fortuitous event," but as a normal incident of carrying on the business of an advertising agency in the usual way. See Randall v. Meredith, 76 Tex. 669, 13 S.W. 576, 582 (1890).