MARY M. ROUSE, complainant-appellant,

*v.*

GEORGE S. POLLARD, THEODORE J. BADGLEY, THEODORE McC. MARSH, IRVING RIKER, ROBERT S. POLLARD and ANDREW VAN BLARCOM, defendants-respondents, and THOMAS E. FITZSIMMONS, defendant.

[Argued May 28th, 1941. Decided September 19th, 1941.]

*Mr. Charles Hershenstein,* for the complainant-appellant.

*Mr. Charles R. Hardin* and *Messrs. Child, Riker, Marsh & Shipman,* for the defendants-respondents George S. Pollard, Theodore J. Badgley, Theodore McC. Marsh, Irving Riker and Robert S. Pollard.

*Mr. Andrew Van Blarcom, pro se.*

The opinion of the court was delivered by

CASE, J. This is an appeal by the complainant from a final decree in Chancery dismissing the bill as to all of the partners formerly of the law firm of Riker & Riker except Thomas E. Fitzsimmons against whom the decree ran as a judgment in the amount of $20,500 with interest and costs. The suit was to charge all of the members of the firm with liability for what was, in effect, an embezzlement of complainant's funds by the defendant Fitzsimmons in the above named amount.

The appeal presents two main questions, one of fact and the other a mixed question of fact and law. Did complainant intend to entrust her funds to the firm of Riker & Riker, or did she intend to entrust them to Thomas E. Fitzsimmons personally? If she purposed to place them with Riker & Riker through the agency of Fitzsimmons, is she entitled, under the law as applied to the facts, to hold the members of the firm, other than Fitzsimmons, liable?

Complainant sought a separation from her husband. In or about the month of June, 1927, she went to the firm of Riker & Riker, stated her case and was referred to Fitzsimmons, a member of the firm. The separation agreement was signed, and there were a few other legal services rendered. In the course of the incidental conferences Fitzsimmons asked Mrs. Rouse what money she possessed and was informed by her of the amount thereof and the manner in which it was invested. According to Mrs. Rouse:

"He said the securities was a bad thing for a woman in my position to have and he suggested that I turn over my securities and sell them and turn the money over to the firm, that they dealt in gilt edge mortgage bonds, as he said. He said that they did that for their clients and it was perfectly secure. I asked if it was all right for me and he said that is the only way they would take care of it and I would get my check every six months. He said if I handed it at once they would place it the 1st of July and I did place it the 15th and the 15th of January was the first check."

Mrs. Rouse wrote to her brokers directing them to sell her securities and to "forward a check for the same payable to me to my attorney, Mr. Thomas E. Fitzsimmons, c/o Riker & Riker, 24 Commerce Street, Newark, N. J." A check for $28,252.67 was sent as directed, was endorsed by Mrs. Rouse "Pay to the order of Thos. E. Fitzsimmons" and was deposited by Fitzsimmons in his personal bank account. No part ever came to the firm except $350, or thereabouts, which was paid by Fitzsimmons to the firm for the legal services rendered, and no member of the firm, other than Fitzsimmons, knew of the transaction. The bill of complaint specifically exonerates the remaining members from any fraud, deceit or misappropriation. On January 16th, 1928, Fitzsimmons wrote Mrs. Rouse. "Enclosed herewith find my check for $825, being six months' interest at 6% on the $27,500, which I have invested for you." On July 19th, 1932, Fitzsimmons wrote: "I enclose herewith check for $615, representing six months' interest on the money which I have invested for you." For more than ten years interest payments went to Mrs. Rouse by Fitzsimmons' personal check. $7,000 of the principal was returned to her, likewise by Fitzsimmons' check, and the receipt was by Mrs. Rouse to Fitzsimmons, personally. The letter from Fitzsimmons to Mrs. Rouse accompanying the check reads:

"As requested, I enclose herewith check for $7,000, which sums is to be deducted from the amount which I have invested for you on bond and mortgage. I am also enclosing a receipt for such amount which I would request you to sign and return to me."

So, too, the receipt to Mrs. Rouse showing a balance retained to invest is by Fitzsimmons, personally. That was in October of 1931. On December 31st, 1932, Fitzsimmons retired from the firm of Riker & Riker, and complainant had actual notice of this fact at that time or shortly thereafter. From then on Fitzsimmons' letters to Mrs. Rouse were written on his own stationery from his new office address, and Mrs. Rouse never thereafter went to, or communicated with, the Riker firm until after she had learned, in the early spring of 1938, of Fitzsimmons' defalcations and arrest.

The experience of Mrs. Rouse is tragic and painful, but we must get, as best we may, at the facts. Her testimony reveals a faulty memory and a frail grasp upon the essentials of a business transaction. Fitzsimmons' testimony is in conflict with hers on whether the money was paid over to be held by Riker & Riker or by him personally. He denies that he ever told her that Riker & Riker took money for clients and paid the interest or that her money could, through the efforts of the firm, be invested in first mortgages, or that it was the policy of the firm to invest clients' money. Without additional weight his testimony would count for little; but the documentary and circumstantial evidence leans heavily towards the conclusion that Mrs. Rouse did not, and did not intend to, place her money with the firm of Riker & Riker; that, on the contrary, she confided in, and rested upon the integrity of, Fitzsimmons and placed her money with him individually for investment; and that she constantly knew of that status although she probably did not appraise the legal significance of it until Fitzsimmons' financial integrity had been shattered. Perhaps the initial respect which Mrs. Rouse entertained for Fitzsimmons' business sagacity and investment acumen was seeded in the fact that he was a member of the Riker firm; but he was a member of that firm for the practice of law, and that membership did not *per se* create liability by his partners for his acts outside the general scope of the practice of law. There is a quality intimately personal to Fitzsimmons in all of the communications that passed between him and Mrs. Rouse about her money affairs. It was to him, personally, that Mrs. Rouse endorsed the check for the original funds. It was he who, according to his letters to complainant, had "invested" the money for her. It was he who, by his personal checks, paid the interest and repaid a portion of the principal. And so on. We conclude that Mrs. Rouse knowingly placed her funds with Fitzsimmons, personally, for investment by him, likewise personally, and that Riker & Riker were neither the depositaries nor the proposed investors.

But if this were not so; if Fitzsimmons, as appellant now understands the fact to be, represented to her that the firm

of Riker & Riker undertook to accept money in bulk from clients for future investment by and at the discretion of the attorneys in undesignated securities, and would do that for her; we are then confronted with the question whether Fitzsimmons, as a member of a firm of lawyers, bound together simply by an oral agreement "for the practice of law," could obligate his partners to such a venture. When Mrs. Rouse went to the offices of Riker & Riker in reliance upon their reputation as a law firm, stated the purpose of her visit, which was to obtain a legal service, and was introduced to Fitzsimmons as a member of the firm who would render the desired service, she had no justification therein for relying upon the responsibility of the partnership for any disconnected service assumed by Fitzsimmons outside one that was characteristically within the practice of law.

Appellant contends that the investment of the funds in mortgages was within the scope of the defendant firm's practice or within the scope of Fitzsimmons' apparent authority. The proofs do not sustain the implication that the practice of this particular firm embraced the acceptance of clients' money to be placed at the firm's discretion in investments thereafter to be ascertained and selected, whether in first mortgages or otherwise. The firm did engage extensively in what is known as a "real estate practice;" it represented banks, building and loan associations and estates; it examined titles, closed mortgages and drew necessary documents relating to mortgage investments by clients; it had clients' funds and trust funds on deposit awaiting the closing or other requirements of transactions for which such funds were held; it did not do a general investment business and it did not accept funds for future, unspecified investment, at the firm's discretion, in mortgages or otherwise.

It has long been a recognized incident to the general practice of law, more extensively developed in some offices than in others, to make note of such clients as have moneys to invest on bond and mortgage, to bring the attention of those clients to the applications of proposed borrowers and, after the principals come to an agreement, to search the title, draw the necessary documents, even hold the money against the

event, place the recordable papers on record and in general superintend the closing of the transaction. But we do not understand that it is a characteristic function of the practice of law to accept clients' money for deposit and future investment in unspecified securities at the discretion of the attorney, and we find to the contrary. It is possible that attorneys in isolated instances have done this; just as it is possible that a person of any profession or occupation has done so. It has not, however, been done by lawyers, in this jurisdiction at least, with such frequency or appropriateness as to become a phase of the practice.

The English cases sustain the principle that where money is received by one member of a law partnership for the expressed purpose of a special investment, *Eager* v. *Barnes, 31 Beav. 579; 54 Eng. Rep. 1263,* there may be liability by one partner for the misconduct of another in the misapplication of the fund, but that if one of the partners receives money indefinitely, to lay out when a proper security may be found, he is not acting within the character of an attorney and does not thereby make his partner liable, *Bourdillon* v. *Roche, 27 L. J. (N. S.) Ch. 681; Harman* v. *Johnson, 2 El. & Bl. 61; 118 Eng. Rep. 691. Blair* v. *Bromley, 16 L. J. (N. S.) Ch. 105, 495,* cited by appellant, is not *contra*. It turns on the fact that the money was paid in on the representation that it was for investment in a particular mortgage executed or to be executed by one Seabrook.

We have found that the incident sued upon, that is, the placing of money for the purposes named, is not a function of the practice of law and that it was not a part of any practice indulged in by the respondents; but beyond this appellant contends that it was within Fitzsimmons' apparent authority and so seeks to fasten liability upon respondents under that well known rule in the law of agency. The facts for the application of the principle do not exist. The respondents did nothing to indicate that Fitzsimmons had any authority to act in their behalf outside the practice of law.

Another point is that respondents should be made to answer for the loss upon the theory that inasmuch as they and the complainant were both innocent the burden should

rest upon them because they put Fitzsimmons in the position where he was able to perpetrate the fraud upon complainant; and, yet another, that the respondents received a part of the funds and so are estopped from denying the authority of Fitzsimmons. These contentions also rest upon a warped view of the facts. The paying over of the money to Fitzsimmons not only was not an act in the practice of law, it was not a part of or connected with any transaction which Fitzsimmons was conducting or was authorized to conduct for the firm. The amount of $350 did not go to respondents as a participation in a tortious transaction but from money that belonged to Mrs. Rouse and in payment of legal services that were performed by the firm for her. The existence of the debt and the propriety of the charge were not in dispute. The money was paid to them in ignorance on their part, then and for many years thereafter, of any wrongdoing by Fitzsimmons, and without facts in their knowledge, or chargeable to their knowledge, which served to put them on notice. We find no element of estoppel.

The decree in the court below will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, THOMPSON, JJ. 13.

*For reversal*—None.