Argued June 7, reversed and remanded October 18, petition
for rehearing denied November 21, 1967

CROISANT, *Appellant, v.* WATRUD ET AL,
*Respondents.*

432 P. 2d 799

Department 1.

*Donald H. Coulter,* Grants Pass, argued the cause for appellant. With him on the briefs were Coulter & Myrick, Grants Pass.

*Ervin B. Hogan,* Medford, argued the cause and filed a brief for respondents Zamsky and Molatore.

Before PERRY, Chief Justice, and MCALLISTER, O'CONNELL, GOODWIN and DENECKE, Justices.

O'CONNELL, J.

This is a suit in equity for an accounting brought against co-partners in a firm of certified public ac-

countants and the executrix of a deceased partner, LaVern Watrud. Plaintiff appeals from a decree in favor of defendants.

We shall refer to the deceased partner, Watrud, as one of the defendants. The defendants engaged in the accounting practice with their principal office in Klamath Falls and their branch office in Medford. Watrud was in charge of the Medford office.

Plaintiff was the owner of a sawmill, timberlands, and other property over which she exercised general control, delegating the details of management of the business to others.

In 1955 plaintiff employed the defendant partnership to advise her on tax matters and to prepare income tax returns for her business enterprises. All of these services were performed by Watrud, who was in charge of the Medford office.

In 1956 plaintiff sold her sawmill. Thereafter her business activities consisted almost entirely of making collections under the contract for the sale of the mill, collections on the sale of timber, collections of rents, and various disbursements from the moneys so collected.

In 1957 plaintiff moved to California. She made arrangements with Watrud to make the collections referred to above, to make certain disbursements, to keep her financial books and records, and to prepare her financial statements and tax returns. The moneys collected by Watrud were deposited in the account of the Lloyd Timber Company (plaintiff's business name in Oregon) in a Grants Pass bank.

In 1957 plaintiff learned that her husband, Glenn Lloyd, had induced Watrud to make unauthorized payments out of the Lloyd Timber Company account to

him. Plaintiff instructed Watrud not to make any further payments to her husband, but Watrud violated her instructions. Plaintiff was informed of these subsequent misappropriations by Watrud on behalf of Glenn Lloyd in 1958. She also learned that her husband was unfaithful to her. Plaintiff again excused Watrud's breach of trust and her husband's infidelity. After their reconciliation, plaintiff and her husband took a trip to Europe. When they returned, plaintiff discovered that her husband had forged checks on her California bank account and had also forged her signature upon a $75,000 note and negotiated it. Plaintiff also became aware of the fact that Watrud had continued to pay money to Glenn Lloyd out of plaintiff's Oregon account. In addition, she learned that Watrud, without authorization, had drawn a check payable to himself. When Watrud was confronted with this evidence he finally acknowledged his abuse of his trust. Soon thereafter Watrud died from gunshot wounds while hunting. Plaintiff then filed this suit for an accounting against the surviving partners.

The trial court held that the trust assumed by Watrud in handling plaintiff's business affairs was an "independent trustee employment," separate and distinct from the activities in which the partnership itself was engaged.

It is undisputed that plaintiff's initial business arrangements for tax advice and the preparation of tax returns were with the partnership and not simply with Watrud individually. After the partnership was employed, Watrud individually performed all of the services sought by plaintiff. As time went on plaintiff called upon Watrud to perform additional services in connection with her business including the collection and disbursements of funds. The initial question is

whether these subsequent services performed by Watrud are to be regarded as having been performed as a part of the partnership business or under a separate arrangement calling only for the services of Watrud personally.

The record suggests that plaintiff, Watrud, and defendants considered all of Watrud's services to the plaintiff as services performed by a member of a partnership on behalf of that firm. The partnership received a check each month for all of Watrud's services including the services involved in handling plaintiff's business affairs. Had the parties viewed the services in making collections and disbursements for plaintiff as independent activities separate compensation would have been in order. Although the partnership's Medford office was geographically separated from the Klamath Falls office, both operations constituted one autonomous business enterprise and consequently defendants cannot insulate themselves from liability on the ground that the Medford office was a separate business operation. Defendants are liable, therefore, if Watrud can be regarded as the agent of the partnership in performing the fund-handling services for plaintiff.

■■ It is clear that Watrud had no express authority from defendants to perform these services. And there was no evidence from which an authority implied in fact could be derived. If it were common knowledge that accountants frequently act as trustees in the collection and disbursement of funds, we would be in a position to take judicial notice of the common practice and thus find an implied authority or an apparent authority. But we have no basis for saying that accountants commonly or frequently perform fund-

handling services. Thus we conclude that liability cannot be rested upon a manifestation by defendants that they assented to be bound for such services. However, an agent can impose liability upon his principal even where there is no actual or apparent authority or estoppel. An agent may have an "inherent agency power" to bind his principal. Such power is defined in Restatement (Second), Agency § 8A as "the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." When an agent has acted improperly in entering into a contract the inherent agency power "is based neither upon the consent of the principal nor upon his manifestations."① The scope of the principal's liability under an inherent agency power is stated in Section 161:

> "A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized." Restatement (Second), Agency § 161, p. 378 (1958).

It will be noted that Section 161 states that the principal is liable only for his agent's acts "which *usually accompany* or are *incidental* to transactions which the agent is authorized to conduct \* \* \*." (Emphasis added.) As we have previously observed, we have neither evidence nor judicial knowledge of

---

① Comment to § 8A, p. 37.

the practice of accountancy from which to decide whether the collection and disbursement of accounts is commonly undertaken by accountants. We cannot say, therefore, that the fund-handling services performed by Watrud in this case were the type which "usually accompany" the transactions which accountants ordinarily conduct viewed from the standpoint of those engaged in accountancy. Upon similar reasoning we are unable to say that the services here were "incidental" to the transactions Watrud was authorized to conduct.

But this does not conclude the matter. Assuming that accountants do not regard the collection and disbursement of funds as a part of the services usually offered by members of their profession, what significance should this have if, in the particular circumstances, a person dealing with a member of an accounting partnership reasonably believes that accountants perform the kind of service which he seeks to have performed? If the phrase "acts * * * which usually accompany * * * transactions which the agent is authorized to conduct" is to be tested solely from the viewpoint of accountants in describing the kind of services they usually perform then, of course, Section 161 of the Restatement (Second) of Agency would not be applicable even though a client of an accounting firm mistakenly but reasonably believed that the services he requested were not alien to the work of accountants. The basis for the principal's liability under these circumstances is best explained by the comments appended to Section 8A and related sections of the Restatement; whether the theory is categorized as one of apparent authority (treating the circumstances as a manifestation of authority by principal),

or as arising out of an inherent agency power is immaterial. The rationale begins with the idea that:

"The principles of agency have made it possible for persons to utilize the services of others in accomplishing far more than could be done by their unaided efforts. * * * [The] primary function in modern life is to make possible the commercial enterprises which could not exist otherwise. * * * Partnerships and corporations, through which most of the work of the world is done today, depend for their existence upon agency principles. The rules designed to promote the interests of these enterprises are necessarily accompanied by rules to police them. It is inevitable that in doing their work, either through negligence or excess of zeal, agents will harm third persons or will deal with them in unauthorized ways. It would be unfair for an enterprise to have the benefit of the work of its agents without making it responsible to some extent for their excesses and failures to act carefully. The answer of the common law has been the creation of special agency powers or, to phrase it otherwise, the imposition of liability upon the principal because of unauthorized or negligent acts of his servants and other agents. * * *" Restatement (Second) Agency, § 8A, comment *a* (1958).

The basis for principal's liability under this section is further explained in the comment as follows:

"* * * His liability exists solely because of his relation to the agent. It is based primarily upon the theory that, if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when such an agent, although without authority to do so, does something which is usually done in connection with the transactions he is employed to conduct. Such agents can properly be regarded as part of the principal's organization in much the same way as a servant is normally part of the master's business enterprise. In fact most general agents are

also servants, such as managers and other persons continuously employed and subject to physical supervision by the employer. The basis of the extended liability stated in this Section is comparable to the liability of a master for the torts of his servant. See Comment *a* on § 219. In the case of the master, it is thought fair that one who benefits from the enterprise and has a right to control the physical activities of those who make the enterprise profitable, should pay for the physical harm resulting from the errors and derelictions of the servants while doing the kind of thing which makes the enterprise successful. The rules imposing liability upon the principal for some. of the contracts and conveyances of a general agent, whether or not a servant, which he is neither authorized nor apparently authorized to make, are based upon a similar. public policy. Commercial convenience requires that the principal should not escape liability where there have been deviations from the usually granted authority by persons who are such essential parts of his business enterprise. In the long run it is of advantage to business, and hence to employers as a class, that third persons should not be required to scrutinize too carefully the mandates of permanent or semi-permanent agents who do no more than what is usually done by agents in similar positions." Restatement (Second), Agency § 161 at p. 379-380.

■ If a third person reasonably believes that the services he has requested of a member of an accounting partnership is. undertaken as a part of the partnership business, the partnership should be bound for a breach of trust incident to that employment even though those engaged in the practice of accountancy would regard as unusual the performance of such service by an accounting firm.

■ The reasonableness of a third person's belief in assuming that a partner is acting within the scope of

the partnership should not be tested by the profession's own description of the function of its members. Those who seek accounting services may not understand the refinements made by accountants in defining the services they offer to the public. Whether a third person's belief is reasonable in assuming that the service he seeks is within the domain of the profession is a question which must be answered upon the basis of the facts in the particular case.

■ We are of the opinion that the facts in the present case are sufficient to establish a reasonable belief on the part of plaintiff that Watrud had undertaken all of the work assigned to him by plaintiff as a continuation of the original employment of the partnership firm. The initial work for which defendants were engaged was the preparation of income tax returns. Thereafter plaintiff sought Watrud's advice on tax matters and continued to have him prepare income tax returns for her business ventures. Watrud did not do the actual bookkeeping for plaintiff's business activities when the partnership was first employed, but eventually he prepared and kept in his own custody the financial books and records of plaintiff's enterprises. This service was assumed by Watrud when plaintiff decided to move to California permanently. When plaintiff left Grants Pass she also arranged with Watrud to have him receive all the income from her Oregon and California properties and to make disbursements from the money so collected. Before she employed him to handle her funds she asked him if he was bonded and he assured her that he was. We think it is important to note that the increased responsibilities directed to Watrud coincided with plaintiff's departure for California. Thereafter, Watrud was the only person who drew checks on the account

set up pursuant to the arrangement with plaintiff, although the bank signature card included the names of plaintiff and others. Watrud handled a very substantial amount of plaintiff's money during the course of his employment, drawing as many as 1500 checks per year. The bank statements and cancelled checks were sent directly to Watrud; he collected her business mail at her post office box in Grants Pass and in other respects acted in her behalf after her departure for California. As we have already mentioned, the partnership received compensation for these services at the rate of $800 per month.

As plaintiff testified, nothing was ever said or done by Watrud which might have indicated to her that he was acting on his account as distinguished from acting for the partnership. It was reasonable for plaintiff to assume that the added assignment of collecting and disbursing funds delegated to Watrud was an integral part of the function of one employed to keep the accounts reflecting the income and disbursement of those funds. This assumption, we think, is even more likely in circumstances such as we have here where there is trust and confidence reposed in the person employed.[8] This is not a case in which a person deals with an ordinary commercial partnership. Accountants stand in a fiduciary relation to their clients and out of that relationship there is generated a trust and confidence which invites the client to rely upon the advice and guidance of the one she employs.[9] The fiduciary character of the relationship in these circumstances is clearly explained in *Cafritz v. Corporation Audit Co.*, 60 F Supp 627 (DC Dist, 1945).

[8] See Note, The Accountant's Liability—For What and To Whom, 36 Iowa L Rev 319, 323-24 (1951).

[9] *Id.* at p. 326-27.

In that case the defendant, an accounting firm, was employed by the plaintiff to maintain and audit the records of his enterprises. The defendant was authorized to perform a variety of services for plaintiff including the preparation of checks for plaintiff's signature and the deposit of checks to the plaintiff's account.[4] Defendant's general manager misappropriated some of the checks deposited with defendant and the plaintiff brought suit for an accounting. In holding the defendant liable for the defalcation the court emphasized the fiduciary relation which arose between the plaintiff and the defendant accounting firm. The court said:

> "It is well established that when the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plantiff, because of money or property intrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty. Wootten Land & Fuel Co. v. Ownbey, 9 Cir., 265 F. 91. The burden of proof is on the accountant after he has admitted the relation and the receipt of a certain sum, to prove that he had disposed properly of the amount for which he is accountable, and to show what that amount is. Pappathanos v. Coakley, 263 Mass. 401, 161 N.E. 804."[5] 60 F Supp at 631.

In the present case defendants owed a similar duty for the defalcation of Watrud.

█ The trial court also held that since plaintiff,

---

[4] It is worth noting that the accounting firm in this case held itself out to be skilled and competent to perform collection and payment services.

[5] See also Dantzler Lumber & Export Co. v. Columbia Casualty Co., 115 Fla 541, 156 So 116, 95 ALR 258 (1934).

after learning that Watrud was violating his trust continued to allow him to handle her funds is estopped as against defendants to assert a claim for subsequent breaches of duty by Watrud in paying out money to plaintiff's husband and himself. After a careful reading of the record we are of the opinion that plaintiff did not act unreasonably in further trusting Watrud after the disclosure of his unauthorized payment of funds to plaintiff's husband.

The decree of the trial court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.[6]

---

[6] By stipulation the parties agreed to try initially only the issue of defendants' liability and defer the trial of the issue of the extent of defendants' liability, if any.