Betty L. COOK et al., Petitioners,

v.

BRUNDIDGE, FOUNTAIN, ELLIOTT &
CHURCHILL, a Partnership for the
Practice of Law, Respondents.

No. B-5371.

Supreme Court of Texas.

Feb. 11, 1976.

Rehearing Denied March 24, 1976.

Mary Neal Sisk, Dallas, for petitioners.

Jackson, Walker, Winstead, Cantwell &
Miller, Donald L. Case and Jack Pew, Jr.,
Dallas, for respondents.

STEAKLEY, Justice.

As this case reaches us, it is a suit by
Betty L. Cook, et al, against Brundidge,

Fountain, Elliott & Churchill, a partnership for the practice of law.[1] The suit sought to recover actual and exemplary damages against the law firm arising from alleged breaches of fiduciary duty in the attorney-client relationship, and from alleged fraudulent acts. The breaches and fraudulent acts were alleged to have been committed by Warren C. Lyon, a partner in the firm at the times in question. The motion of the law firm for summary judgment was granted by the trial court and this has been affirmed by the Court of Civil Appeals. 522 S.W.2d 740. The question for decision is whether the law firm established conclusively that it is not liable for the acts of Lyon. We hold that it did not and so reverse the judgments below and remand the cause for trial.

We learn the following from the summary judgment record. Brundidge, Fountain, Elliott & Churchill is a partnership engaged in the practice of law in Dallas, Texas. Warren C. Lyon was a partner of the law firm at the times in question. As such, in 1969, he represented the plaintiff Betty L. Cook in a divorce proceeding; he also prepared a will for her and for Isabelle Griffin, another plaintiff. Fees were charged by the law firm for these services and paid by Betty L. Cook and Isabelle Griffin. Lyon was also engaged in the real estate business and was an officer and stockholder in Texas Yummers, a Texas corporation. He also owned stock in a California company known as United States Franchise Corporation which assisted with the organization of Texas Yummers. Fees were also paid to the law firm by Texas Yummers.

Sometime in 1969, during a conference with Lyon concerning her divorce, Betty L. Cook informed Lyon that she, together with her aunt, Mrs. Isabelle Griffin, and her sister, Winifred Baker, were receiving approximately $60,000 from the sale of some property which had come to them from an estate in Illinois. Betty L. Cook asked Lyon if he knew of someone with whom they could consult concerning the investment of this money in some real estate in Texas. Lyon told her he was a silent partner in a real estate firm and might be able to help her. He suggested several investments and then told her about Yummers, a fast-food franchise operation based in California, in which he had invested at, he said, substantial profit. Lyon said he had obtained a Yummers franchise and was in the process of forming a Texas corporation to handle it.

Betty L. Cook, et al, decided to invest in Yummers. They directed their attorney in Illinois to send Lyon a check for the proceeds of the sale of the land in Illinois, which he did. The check was dated July 3, 1969, and was in the sum of $60,343.25; it was made payable to "Warren Lyon as Attorney for Isabelle M. Griffin, Winifred Baker and Betty Cook." The check was mailed to and received by Lyon at the office of the law firm but there is no showing that the funds were deposited in or handled by or through any account of the law firm.

On July 9, 1969, Betty L. Cook, et al, conferred with Lyon in the law firm's office. A contract was executed whereby they loaned to Texas Yummers Corporation a minimum of $50,000 to be used in the construction of a Yummers store in Dallas. Lyon signed the contract as president of Texas Yummers. Betty L. Cook, et al, alleged under oath that Lyon represented to Plaintiff Cook, Mrs. Griffin and Mrs. Baker that he had prepared the contract, that it was a good and valid mortgage contract and that as their attorney he could assure them that their interests were well-protected. Betty L. Cook testified that Lyon represented to them that their funds had been placed in a trust account until it could be invested in the new store: "The money was

---

1. As originally filed, the suit complained also of Warren C. Lyon, Jerry L. Weaver and Roger Milton; upon motion of Betty L. Cook, et al, the trial court severed the cause of action against the other defendants, and this severed cause now pends in the trial court.

going to be held until actually the property was bought and the building begun and the pay back started, which was September 15. . . . It was to be paid back to us at one thousand dollars a month to be divided equally between the three of us for fifteen years."

The payment due September 15, 1969, under the July 9 contract was not made. On October 16, at Betty L. Cook's request, Lyon sent Isabelle Griffin a check for $250 from Texas Yummers Corporation to cover her living expenses.

During October and November of 1969, Lyon persuaded Betty L. Cook, et al, to exchange their rights under the July 9 contract for stock in Texas Yummers. Betty L. Cook, et al, agreed to take 12,000 shares each, at $1.00 per share, plus a $19,000 note from Texas Yummers. Betty L. Cook also gave Lyon $5,000 for 5,000 more shares on November 14. On December 4, Lyon and Weaver executed and Betty L. Cook, et al, received the $19,000 note from Texas Yummers. On December 23, Betty L. Cook signed an "investment letter" promising to purchase 17,000 shares; Isabelle Griffin and Winifred Baker signed similar letters for 12,000 shares each. In February of 1970, Betty L. Cook, et al, received what purported to be stock certificates for Texas Yummers.

The facts regarding Texas Yummers Corporation were these: a Texas Yummers Corporation was incorporated on February 27, 1969; Lyon was designated as an incorporator and director. The law firm was retained by United States Franchise Corporation, a California corporation which owned and operated "Yummers" stores in California, to set up this Texas corporation. On March 3, 1969, Texas Yummers paid the law firm $500 as a retainer; the check was signed by Lyon. $50,000 of the funds of Betty L. Cook, et al, was deposited in an account of Texas Yummers.

On December 2, 1969, Texas Yummers was dissolved, and a new Texas Yummers Corporation was formed; Lyon was again an incorporator and director. On July 21, 1972, a Petition for Involuntary Bankruptcy of Texas Yummers was filed; on August 11, the corporation was adjudged bankrupt. On September 12, a meeting of the creditors of the corporation was held. Soon thereafter, this suit was instituted.

As indicated in the forepart of this opinion, the severed proceeding before us seeks the recovery of damages against the partnership law firm upon the theory of vicarious liability for the acts of Lyon, a partner. We are concerned at this stage with the motion of the law firm for summary judgment that was sustained by the trial court and upheld by the Court of Civil Appeals upon the stated conclusion:

. . . that the summary judgment proof established as a matter of law that Lyon had neither the actual authority nor the apparent authority to represent the law firm in the fraud perpetrated upon plaintiff. Such proof shows the fraudulent acts by Lyon were not consented to, authorized, ratified, or adopted by the other members of this law firm. 522 S.W.2d 740, 742.

This holding of the Court of Civil Appeals states the essential position of the law firm.

It should also be stated that the problem at hand does not involve in any respect the question of the personal liability of a lawyer who defrauds a client, whatever the circumstances.

The motion of the law firm for summary judgment relied for support on its filed answer, on the affidavits of Lyon, and of Ralph D. Churchill, a senior member of the firm; and upon the deposition testimony of Betty L. Cook, a plaintiff, and Charles A. Girand, a licensed Texas attorney engaged in the practice of law in Dallas.

The answer of the law firm admitted that Lyon was a partner in the practice of law but denied that he was a partner, or that he was acting in the capacity of a partner, "in giving the advice, performing the services and doing or omitting to do the acts com-

plained of by plaintiffs." As to such, he was, the law firm alleged, acting in his individual capacity.

The affidavit of Lyon was to the same effect, i. e., that in all transactions with Betty L. Cook, other than with respect to the divorce proceeding and the preparation of a will for her, he was acting in his individual and personal capacity, for which the law firm received no fee or payment from Betty L. Cook.

The affidavit of Churchill was to the effect that the firm is engaged exclusively in the practice of law; that Lyon as a partner was not authorized to act as an investment counselor, securities broker or dealer, or to act as a real estate broker, dealer or agent, and that Lyon was not a partner in the performance of any such services performed for Betty L. Cook; that the only service Lyon performed as a partner was the handling of a divorce for Betty L. Cook and the preparation of a will for her and perhaps a will for one of the other plaintiffs; that Lyon was acting in his individual capacity with respect to his real estate business and as a stockholder in United States Franchise Corporation, and in the corporation known as Yummers; and that "this firm received no fee, payment, commission, or profit in any of such transactions."

The deposition testimony of Girand was directed to the reasons for the dissolution of the original incorporation of Yummers and the formation of the second corporation.

The deposition of Betty L. Cook, who was deposed as a witness on behalf of the defendants, Lyon and Weaver, dealt principally with the sequence of events in her relationship with Lyon. She also filed an affidavit in support of her response to the motion of the law firm for summary judgment. In this she stated:

At no time in my dealings with Defendant Lyon did he indicate that he was acting in any capacity other than as my attorney at law or separate from the law firm of which he was a partner. Stuart L. Mamer, an attorney of Champaign, Illinois had represented members of my family and me for several years and he acted as attorney for me, Mrs. Baker, Mrs. Griffin and my father, Professor B. F. Timmons, with regard to the sale of the Illinois property. Based on my conversations with Defendant Lyon, Mr. Mamer was told by me, Mrs. Griffin and Mrs. Baker that we had retained Defendant law firm through its partner, Defendant Lyon, to represent us in Texas, and had been accepted as clients by the Defendant law firm through its partner, Defendant Lyon. Mr. Mamer made the check for $60,343.25 payable to "Warren Lyon, as Attorney for Isabelle M. Griffin, Winifred Baker and Betty Cook" because Defendant Lyon had assured us that as our attorney he would protect and hold the funds for us pending their investment.

There was also filed by Betty L. Cook, et al, the affidavit of Stuart M. Mamer, their attorney in Champaign, Illinois. His activities, with particular reference to the law firm in Texas, were described as follows:

In the Spring of 1969, I was retained by Professor Timmons and Mmes. Cook, Baker and Griffin to represent them in the sale of Champaign property and was informed that Mmes. Cook, Baker and Griffin desired to re-invest the proceeds in real estate in Dallas, Texas. I was informed by telephone calls and correspondence from each of the three Plaintiffs herein that they were represented by counsel in Dallas, Texas. They informed me that their attorney was Warren C. Lyon, a member of the Dallas law firm of Brundidge, Fountain, Elliott & Churchill.

After the sale of the Illinois property was consummated, I deposited the proceeds therefrom in the separate Trust Account maintained by our law firm in the First National Bank of Champaign, Illinois, for the purpose of segregating our clients' funds. On July 3, 1969, I

drew a check on this Trust Account to the order of "Warren Lyon, as Attorney for Isabelle M. Griffin, Winifred Baker and Betty Cook."

I received a letter dated July 14, 1969, from the law firm of Brundidge, Fountain, Elliott & Churchill bearing the signature "Warren Lyon." I received a letter dated August 12, 1969, in the same style. The first of these letters showed that copies thereof had been sent to Mmes. Cook, Baker, and Griffin.

As requested in the law firm's letter of July 14, 1969, I did indeed compute the capital gains taxes and prepared the necessary schedules for the 1969 income tax returns of Mmes. Cook, Baker, and Griffin.

The July 3, 1969, check on our Trust Account in the amount of Sixty-Thousand Three Hundred Forty Three and 25/100 Dollars ($60,343.25) was subsequently paid by our bank. It was endorsed "Warren Lyon, Attorney for Isabelle Griffin, Winifred Baker & Betty Cook."

Vicarious liability of the law firm for the alleged damages suffered by Betty L. Cook, et al, is not claimed on the basis of any negligence or breach of duty on the part of the other members of the law firm; nor is it claimed that the other members of the law firm became cognizant of the acts of Lyon, or in anywise consented to or ratified his course of dealings with Betty L. Cook, et al. Cf. *Kelsey-Seybold Clinic v. Maclay*, 466 S.W.2d 716 (Tex.1971). There is no claim, on the other hand, that Lyon or the law firm gave notice to Betty L. Cook, et al, that Lyon's authority as a partner was limited in any respect, or, more specifically, that any act of Lyon for his individual profit, or in which he had a personal interest, would be outside his authority as a member of the partnership.

The question of the liability of a professional partnership of attorneys for the acts of a partner not strictly legal in nature, but which occur during the existence of the attorney-client relationship in recognized legal matters, is of first impression in our jurisdiction. Other jurisdictions have dealt with the problem of determining the scope of business of a professional partnership in various ways. In *Rouse v. Pollard*, 130 N.J.Eq. 204, 21 A.2d 801 (Ct.Err. & App. 1941), the partner of a law firm persuaded a client whom he was representing in a divorce to entrust him with some of her money for investment with "the firm." The client sued the partner and the partnership to recover her funds, and the trial court dismissed the suit as to the partnership on the ground that the partner's actions were not within the normal scope of business of a law practice. Affirming the trial court's dismissal, the New Jersey Court of Errors and Appeals relied on a distinction developed in England:

> The English cases sustain the principle that where money is received by one member of a law partnership for the expressed purpose of a special investment, . . . there may be liability by one partner for the misconduct of another in the misapplication of the fund, but that if one of the partners receives money indefinitely, to lay out when a proper security may be found, he is not acting within the character of an attorney and does not thereby make his partner liable. 21 A.2d at 804.

In *Douglas Reservoirs Water Users Ass'n v. Maurer & Garst*, 398 P.2d 74 (Wyo.1965), Maurer, a partner in the law firm, misappropriated a $10,000 check given to him by the Water Users Association, of which he was a member and the treasurer; the funds were supposed to be used to purchase a bond in the name of the association. The Wyoming Supreme Court affirmed a summary judgment in favor of the law partnership, holding that Maurer was not acting within the ordinary scope of the partnership business as a matter of law when he misappropriated the funds:

> There is nothing to indicate that legal work had been involved in collecting money from the United States for Doug-

las Reservoirs Water Users Association, or that the $10,000 check had been entrusted to Maurer for a transaction ordinarily performed by lawyers. 398 P.2d at 77.

In *Blackmon v. Hale*, 1 Cal.3d 548, 83 Cal.Rptr. 194, 463 P.2d 418 (1970), the plaintiff gave an attorney a check payable to the attorney's partnership trust account, in order that funds would be available to the attorney in negotiations for plaintiff's purchase of a note and mortgage on some real property. The partner misappropriated the funds, and plaintiff sued the partnership for their recovery. Reversing the trial court's judgment in favor of the partnership, the California Supreme Court held that the partnership was liable for the partner's malfeasance on the ground that the partner was acting within the scope of his apparent authority in accepting plaintiff's funds.

The Court stated, at 83 Cal.Rptr. 194, 199, 463 P.2d 423, 424:

Although the firm's records indicate that Adams and Hale regarded plaintiff as a client of Adams only, there is no evidence whatever that either Adams or Hale ever informed plaintiff that Adams was not representing plaintiff as a member of the firm. Moreover, Adams and Hale held themselves out to the public and to plaintiff as partners. The partnership displayed a sign viewable from the street reading "Adams and Hale, Attorneys at Law." Such signs are commonly used by law firms to indicate a partnership. (See *Fletcher v. Pullen* (1889) 70 Md. 205, 213, 16 A. 887, 888.) Plaintiff testified that he knew that the firm was called Adams and Hale and that he dealt with Adams in the firm's offices. Furthermore, Adams instructed plaintiff to make his check payable to the Adams and Hale Trust Account. In the absence of other evidence these facts would justify a reasonable man in believing that he was dealing with a partnership.

In *Zimmerman v. Hogg & Allen, P. A.,* 286 N.C. 24, 209 S.E.2d 795 (1974), Greene, who was a principal shareholder in Hogg & Allen, a professional association for the practice of law, represented Zimmerman, who was an officer and employee of a company which had engaged Hogg & Allen as its general counsel, in some personal legal matters. Zimmerman sent Greene $24,000 to be used in the purchase of shares of Kentucky Fried Chicken. Zimmerman sued Greene and Hogg & Allen for misappropriation of his money. Reversing the trial court's summary judgment in favor of Hogg & Allen, the North Carolina Supreme Court held that there was a fact question whether, in accepting Zimmerman's money, Greene was acting within the normal scope of business of the professional association. The court stated its conclusions as follows:

Under these particular circumstances, we are of the opinion that plaintiff's evidence was sufficient to justify a reasonable and prudent belief by plaintiff Sam Zimmerman that the Professional Association had conferred authority upon Greene to receive the funds from him for investment while acting as its agent. Thus plaintiff's evidence raised a genuine material issue for trial as to whether Greene acted within the scope of his authority and as agent for the Professional Association at the times complained of. The issue so raised was material because without establishing agency, plaintiff could not recover  . . . . 209 S.E.2d at 804, 805.

In *Croisant v. Watrud*, 248 Or. 234, 432 P.2d 799 (1967), plaintiff had engaged an accounting firm to advise her on tax matters and to prepare tax returns for her business enterprises. After selling one of her businesses, she made arrangements with a member of the accounting firm, who had handled the business of plaintiff for the firm previously, to collect payments under the contract of sale, as well as some collection of rents from other property, and to make various disbursements of the money. The funds collected were deposited in an

account of plaintiff, from which the accountant had authority to make withdrawals. The accountant misapplied some of the funds, and plaintiff sued the accountant's partnership to recover the loss. The Oregon Supreme Court, reversing a judgment in favor of the partnership, held that the partnership was liable for plaintiff's loss, even though the accountant's services to plaintiff were not services ordinarily performed by accounting firms:

> If a third person reasonably believes that the services he has requested of a member of an accounting partnership is [sic] undertaken as a part of the partnership business, the partnership should be bound for a breach of trust incident to that employment even though those engaged in the practice of accountancy would regard as unusual the performance of such service by an accounting firm.

> The reasonableness of a third person's belief that a partner is acting within the scope of the partnership should not be tested by the profession's own description of the function of its members. Those who seek accounting services may not understand the refinements made by accountants in defining the services they offer to the public. Whether a third person's belief is reasonable in assuming that the service he seeks is within the domain of the profession is a question which must be answered upon the basis of the facts in the particular case. 432 P.2d at 803.

It is doubtful if the treatment of the problem by these various jurisdictions, and the rationale applied for solutions, can be harmonized; or that an accepted rule can be said to appear. A stricter view against the liability of a professional partnership for the misdeeds of a partner with a client is indicated in *Rouse* and *Douglas Reservoirs*; a more liberal view is indicated in *Blackmon, Zimmerman* and *Croisant*. Surprisingly, also, only two of the jurisdictions, California and Wyoming, considered the problem in the light of their respective uniform partnership acts which, in our view are particularly relevant, if not controlling.

Indeed, the conclusions we reach, later stated, rest in great measure upon the provisions of the Texas Uniform Partnership Act, Vernon's Ann.Civ.St. art. 6132b.

Prior to the enactment of the Texas Act in 1961, there did not exist a comprehensive corpus of substantive law governing the partnership form of business association. See Sher and Bromberg, *Texas Partnership Law in the 20th Century*, 12 Sw.L.J. 263 (1958). Application of the Act to a professional partnership has not been invoked as yet although the dissenting opinion in *Kelsey-Seybold, supra*, involving a medical partnership, recognized that the Uniform Partnership Act, art. 6132b, "provides for liability of the partnership for wrongful acts of a partner 'acting in the ordinary course of the business of the partnership.' " In *Kelsey-Seybold, supra*, however, it was assumed in the writing for the majority that in engaging in the acts in question the doctor-partner was not acting in the ordinary course of the business of the medical partnership; whereas, this is the problem now at hand.

■ There are, admittedly, compelling and unique considerations with respect to partners engaged in the practice of law. The fiducial obligations of a law partnership set it apart from commercial partnerships. For a discussion of the high obligations of a fiduciary see *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509 (1942). These characteristics and obligations inherent in the practice of law are universally understood and acknowledged by the legal profession. Nevertheless, the provisions of art. 6132b are expressly applicable to a professional partnership such as one of law. Section 6 of the Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Section 2 defines "business" as including "every trade, occupation, or profession." Governing the issue at hand, i. e., the conditions to liability of a partnership for the acts of a partner, Sections 9, 13 and 14 of the Act provide:

Sec. 9. (1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, *for apparently carrying on in the usual way the business of the partnership* of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. (Emphasis added)

(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

Sec. 13. Where, by any wrongful act or omission of any partner *acting in the ordinary course of the business of the partnership* or with the authority of his co-partners, loss or injury is cause[d] to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act. (Emphasis added)

Sec. 14. The partnership is bound to make good the loss:

(a) Where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and

(b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.

■ We have recently spoken of apparent authority in terms of estoppel, and have said that one seeking to charge a principal through apparent authority of an agent must prove such conduct on the part of the principal as would lead a reasonable prudent person to suppose that the agent had the authority he purports to exercise.

*Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex.1974). The extent of authority of a partner is determined essentially by the same principles as those measuring the scope of the authority of an agent. In *Randall v. Meredith*, 76 Tex. 669, 13 S.W. 576 (1890), this Court wrote of the implied powers possessed by a partner:

Between partners themselves, and between the firm and persons dealing with the firm, it must be presumed that each partner is the agent of the firm, empowered to carry out its objects, and to transact the business for which the partnership was formed, in the usual and customary way pursued by other firms engaged in a like business; and, in the absence of restrictions on this power, rights must be adjusted in view of its existence. Third persons dealing with a member of a firm in reference to partnership matters, in the absence of power expressly conferred, must recognize the fact that the partner's power to bind his firm is restricted to the doing of such things as are within the scope of the particular business. Between the partners themselves, and between the firm and persons dealing with it through a partner, there is no doubt that the usages of firms engaged in the same character of business in the same country, as well as the general usage of the firm in the conduct of its business, may be looked to to ascertain the implied powers possessed by a partner. If the power exercised in a given case be one usually exercised by partners in a like business, all the members of the firm must be supposed to have intended to confer a like power on each other. If the power be habitually exercised by a partner, and acquiesced in by the other members of the firm, it is but fair to conclude that the members of the firm intended it to be exercised. 13 S.W. at 581, 582.

■ As stated before, it is not claimed either that Lyon was authorized by the partnership to act as he did in the Yummers matter or that Betty L. Cook, et al, had

notice or knowledge that Lyon had no authority to act for the partnership in what he did. Assuming misapplication of the funds, the crucial consideration in determining whether the law firm is bound by the acts of Lyon by force of the statutory provisions is whether in receiving the funds of Betty L. Cook, et al, in the sum of $60,343.25, Lyon was "apparently carrying on in the usual way the business of the partnership" (Sec. 9); or, as also expressed, whether he was "acting in the ordinary course of the business of the partnership" (Sec. 13). If so, it would follow that Lyon was "acting within the scope of his apparent authority" when he received the money and property of Betty L. Cook, et al; and that the law firm is "bound to make good the loss" from his misapplication of the funds (Sec. 14).

■ It was the burden of the law firm as the defendant-movant for summary judgment to establish as a matter of law that no fact issue stands in the way of judgment in its favor. Cf. *Burns v. Gonzalez*, 439 S.W.2d 128 (Tex.Civ.App.—1969, writ ref'd n. r. e.) with respect to the burden in trial on the merits. The summary judgment burden was that of establishing the negative of the statutory issues, namely, that Lyon was not apparently carrying on in the usual way the business of the law firm, i. e., was not acting in the ordinary course of its business and hence was not acting within the scope of apparent authority by force of statute. See *Torres v. Western Casualty & Surety Co.*, 457 S.W.2d 50 (Tex.1970); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970). The defendant is required to meet the plaintiff's case as pleaded and to demonstrate that the plaintiff cannot prevail. *Glenn v. Prestegord*, 456 S.W.2d 901 (Tex.1970); *Guidry v. Neches Butane Products Co.*, 476 S.W.2d 666 (Tex.1972). There can be no further burden upon the plaintiff if the requisite facts for summary judgment are not established by the summary judgment record. See *Torres, supra*, and *Box v. Bates*, 162 Tex. 184, 346 S.W.2d 317 (1961).

■ As noted earlier, the thrust of the affidavits of Churchill and Lyon in support of the motion for summary judgment was that the law firm is engaged exclusively in the practice of law, and that Lyon was not acting for the partnership in performing the services in question. But at the least, the acceptance by Lyon of the check of $60,343.25 payable to "Warren Lyon as Attorney for" Betty L. Cook, et al, together with the deposition testimony of Betty L. Cook upon which the motion of the law firm for summary judgment also relied for support, and, further, the affidavit of Betty L. Cook and that of the Illinois attorney, demonstrate the existence of fact issues with respect to the statutory conditions to liability of the partnership. This being so, the record does not establish conclusively that the law firm is not accountable to Betty L. Cook, et al, for the acts of Lyon.

The judgments of the trial court and of the Court of Civil Appeals are reversed and the cause is remanded for trial.

Dissenting opinion by McGEE, J., in which GREENHILL, C. J., joins.

McGEE, Justice.

I respectfully dissent. I would hold that in this case the summary judgment proof established as a matter of law that Lyon had neither the actual nor the apparent authority to represent the law firm in the fraud perpetrated upon the petitioners. Further, no liability should rest upon the law firm under any of the controlling provisions of the Texas Uniform Partnership Act. Tex.Rev.Civ.Stat.Ann. art. 6132b (1970).

The record clearly reveals that Mrs. Cook initially asked Lyon whether he knew of someone to whom she could speak concerning the possible investment of certain monies in Texas properties. Thus, aside from her legal problems Mrs. Cook inquired of Lyon whether he knew of someone she could discuss investments with—apparently realizing that any discussion relative to legal matters had ceased. She specifically

inquired as to whether he knew of "either an investment counselor or a real estate person." Lyon's answer was that he was a silent partner in a different field—a real estate firm, and that he could therefore be of some service to her in that separate capacity. It is undisputed that no member of the law firm other than Lyon played any part in, or received any benefit from, Lyon's alleged misapplication of funds. The funds were not deposited in, nor handled by, or through any account of the law firm. Thus, it is clear that the investment counseling by Lyon was done without the knowledge of anyone else in the law firm and that the firm neither received a fee, nor profited in any way by Lyon's actions. The end result is that the pleadings, affidavits and depositions reveal that the activities out of which the defalcations arose did not constitute a partnership endeavor.

In *Randall v. Meredith*, 76 Tex. 669, 13 S.W. 576, 581 (1890), the court stated:

> "Third persons dealing with a member of a firm in reference to partnership matters, in the absence of power expressly conferred, must recognize the fact that the partner's power to bind his firm is restricted to the doing of such things as are within the scope of the particular business."

Nevertheless, the majority has held that the liability of the law firm may ultimately be established under the applicable provisions of the Texas Uniform Partnership Act. Section 4(3) of the Act expressly states that "[t]he law of agency shall apply under this Act." Upon recognizing this fact the majority states that assuming misapplication of the funds, the crucial questions determinative of whether the law firm is to be held liable for Lyon's misdeeds are: " . . . whether in receiving the funds of Betty L. Cook, et al, in the sum of $60,343.25, Lyon was 'apparently carrying on in the usual way the business of the partnership,' (Sec. 9); or, as also expressed, whether he was 'acting in the ordinary course of the business of the partnership'. (Sec. 13). If so, it would follow that Lyon was 'acting within

the scope of his apparent authority' when he received the money and property of Betty L. Cook, et al; and that the law firm is 'bound to make good the loss' from his misapplication of the funds. (Sec. 14)."

Thus, as viewed by the majority, the key is obviously the receipt of the funds. Though I would not limit the construction of the Act simply to the mere receipt of the funds, and aside from the confusion inherent in the majority's statement, I maintain that the liability provisions of the act are clear and well defined. In the present case, it is not claimed that Lyon had been authorized by the partnership to act as he did with reference to the Yummers investment. Nor does anyone claim that Betty Cook, et al, had notice or knowledge that Lyon had no authority to act as he did. Thus, the key questions that must be answered in order to determine whether the law firm is to be held liable are whether Lyon was "acting in the ordinary course of the business of the partnership." (Sec. 13); or, whether he was "apparently carrying on in the usual way the business of the partnership." (Sec. 9). Further, liability may also attach to the law firm if Lyon was "acting within the scope of his apparent authority." (Sec. 14).

Based on my construction of the statutory liability provisions set out in the Texas Uniform Partnership Act as they apply to the present fact situation, I would uphold the summary judgment entered in favor of the law firm. I would hold that the law firm met its summary judgment burden and established that Lyon was not acting in the ordinary course of the partnership business. I would further hold that Lyon was not acting within the scope of his apparent authority, nor was he apparently carrying on in the usual way the business of the partnership within the meaning of the Texas Uniform Partnership Act. The authority of a partner to act as an agent for his partnership is limited to such transactions as are within the scope of the partnership business; and neither the partnership nor the other partners are bound by the unau-

thorized acts of one partner in a matter not within the usual or apparent scope of business of the partnership. Neither a partnership nor its innocent partners are liable for a conversion which is not effected in the course of the firm's business. Similarly, as was revealed in the *Randall* case, supra, third persons dealing with a member of a firm must recognize that the partner's power to bind his firm is restricted to doing things that are within the scope of the particular business. Perhaps the initial respect which Mrs. Cook entertained for Lyon's business sagacity and investment acumen was seeded in the fact that he was a member of that particular law firm; but he was a member of that firm for the practice of law, and that membership did not per se create liability by his partners for his acts outside the general scope of the practice of law. *Rouse v. Pollard*, 130 N.J.Eq. 204, 21 A.2d 801 (1941).

Mrs. Cook's inquiry related to whether Lyon knew of an individual who could serve in the distinct capacity of an investment counselor. Lyon's answer clearly indicated to her that he would be acting in her behalf in a separate, nonlegal capacity. It therefore may not be said that Lyon was "apparently carrying on in the usual way the business of the partnership." Such representations and financial failure arose out of Lyon's own private deal and not in the course of the partnership business. Where a person deals with one of the partners in a matter not within the scope of the partnership, the intendment of the law is that he deals with him on his own private account.

When Mrs. Cook went to the offices of Brundidge, Fountain, Elliott & Churchill in reliance upon their reputation as a law firm to obtain legal advice and met with Lyon as a member of the firm who would render the desired service, she had no justification therein for relying upon the responsibility of the partnership for any disconnected service assumed by Lyon outside one that was characteristically within the practice of law. When Lyon volunteered himself as a real estate and investment counselor in the present case due to Mrs. Cook's instigating inquiry he was not "apparently carrying on in the usual way the business of the partnership," nor was he "acting in the ordinary course of the business of the partnership" within the meaning of the Partnership Act. In this case Lyon was acting in a private, nonlegal advisory capacity, and he was therefore entirely outside the scope of his authority and without the scope of the business carried on by this law firm. Such actions were not incidental to the business of a firm engaged exclusively in the practice of law. Because of these conclusions, it is clear that Lyon was also not "acting within the scope of his apparent authority" when he received the monies of Betty Cook, et al.

This court described "apparent authority" in *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778 (Tex.1974), as follows:

"Apparent authority is based on estoppel, and one seeking to charge a principal through apparent authority of an agent to bind the principal must prove *such conduct on the part of the principal* as would lead a reasonably prudent person to suppose that the agent had the authority he purports to exercise." [Emphasis added].

Since apparent authority is based on estoppel, it cannot be established by the acts of the agent; "it must arise from words or conduct of the principal." *Custom Leasing, Inc. v. Texas Bank and Trust Company of Dallas*, 516 S.W.2d 138, 144 (Tex.1974); *Rourke v. Garza*, 19 Tex.Sup.Ct.J. 36, 530 S.W.2d 794 (Tex.1975). Further, apparent authority in such cases exists only as to those things ordinarily entrusted to one occupying such a position. *Rourke*, supra. In the instant case we find no actions by the principal law firm that would induce Mrs. Cook to believe that Lyon was authorized to act for the firm as a real estate broker or investment counselor. The firm did nothing to indicate to Mrs. Cook that Lyon was authorized to act in their behalf outside of the practice of law. Mrs. Cook herself stat-

ed in her affidavit and deposition that she had no contact with any other member of the law firm beyond greeting Mr. Churchill briefly on a few occasions. The mere fact that the law firm had conferred upon Lyon the authority to practice law within the scope of their partnership would not create the apparent authority to engage in investment counseling transactions as a service disconnected from the practice of law. *See, Great American Casualty Co. v. Eichelberger*, 37 S.W.2d 1050 (Tex.Civ.App.—Waco 1931, writ ref'd).

As a final note, I maintain that it is clearly evident that the majority has failed in its duty to lend a guiding hand to the trial court below. For instance, in what fashion do the three statutory liability provisions interrelate so as to possibly affix liability to the law firm? Since the ultimate outcome is dependent upon these pertinent liability provisions, what are the special issues that should be submitted in such cases? Whose viewpoint or actions determine the existence or nonexistence of liability? What does "apparently carrying on in the usual way the business of the partnership" mean? It is inevitable that the jury will require some form of instruction as to these matters. And, since the term "apparent authority" as set out in the statute has obviously not received its traditional interpretation, that concept will also require further specification and delineation. That problems and confusion are created is evident. The questions which arise call for and deserve answers. This case presents the initial instance in which the partnership liability provisions have been directly confronted and analyzed in such a fashion, and therefore, further guidance is essential.

Nevertheless, as I view the Texas Uniform Partnership Act, even under the petitioners' version of the facts there was no genuine issue as to any material fact, and the matters before the court failed to show any liability on the part of the law firm. Accordingly, summary judgment was prop-

erly entered and the judgment of the court of civil appeals should be affirmed.

GREENHILL, C. J., joins in this dissent.